# WILLIAM E. SEXTON v. METROPOLITAN STREET RAILWAY COMPANY, Appellant.

### Division One, July 11, 1912.

1. **PLEADING: Cause of Action Defectively Stated: Good After Verdict.** If the petition states no cause of action at all its insufficiency can be raised on appeal for the first time. But if it defectively states a cause of action it will under the statute (Sec. 2119, R. S. 1909) be sufficient after verdict.

2. ———: ———: **Negligence: Electrical Machinery: Flashover: Drippings of Tar.** A petition which charges that plaintiff was in charge of an electric machine (called a rotary converter) in defendant's power house, that he was severely burned by a "flashover," that said flashover was caused by tar negligently permitted by defendant to leak through the roof of the building and drop upon said electric machinery, that defendant knew of said tar leaking upon the machinery for six or eight weeks, that its foreman had been requested to repair the same and warned that failure to do so would probably cause damage to the machinery and had negligently failed to repair the leak, and that said accident was caused by the carelessness and negligence of the defendant's foreman in permitting said tar to continue to leak through said roof upon said machinery and in not repairing said roof and preventing said tar from falling on said rotary converter and causing said flashover, defectively states a cause of action, and is sufficient after a verdict rendered without an attack thereon by motion or demurrer, notwithstanding it contains no express averment to the effect that dripping tar would render the machinery dangerous to those using it, or that defendant knew or might have known that tar falling upon an electric rotary converter would render it dangerous, and the only charge of danger is that the foreman was warned that dripping tar would probably cause damage to the machinery.

3. **NEGLIGENCE: Electrical Rotary Converter: Flashover: Caused by Dripping Tar: Insufficient Proof.** To entitle plaintiff to recover under such a petition it was necessary that the proof show that his injuries resulted from the flashover; that such flashover was caused by tar falling upon the electrical rotary converter; that the tar was negligently permitted by defendant to fall from the roof, and that defendant should reasonably have anticipated that its negligent act would occasion injury to the operator of the machine; and where the proof shows that plaintiff's injuries were the result of the flashover and tends to show that tar had been leaking through the roof in

small amounts, but fails to show that tar caused the flashover, and the evidence is such as to demonstrate that it could not have caused it, a verdict for plaintiff cannot stand.

4. ——: ——: ——: ——: ——: **Unreasonable Testimony.** Tar being itself a nonconductor of electricity, and the only method by which it could be the medium of conducting it being its conversion into a flame, which is a conductor, it is unreasonable to be believed, to say that a drop of tar struck the positive brush of the electrical rotary converter on which plaintiff was working, and was reduced to a flame that became a conductor of electricity to the negative brush nineteen inches away and produced a "flashover" electric flame "as big as a half barrel" that sorely burned his hands and face.

5. **PROVINCE OF COURT: Unreasonable Testimony.** No court should be bound by testimony demonstrated to be false by all other facts in the case and by common knowledge of scientific facts, and no legal rule can stifle the conscience of a court when it comes to deal with such testimony. It is impossible to believe the testimony of a physician to the effect that after plaintiff was burned, he found on his breast sixty or seventy particles of tar the size of a pea, where the other testimony shows only one drop of tar dropped from the roof, and that was not discovered by plaintiff himself at work on the crippled brush of the machine.

6. **NEGLIGENCE: Inference Upon Inference: Electric Rotary Converter: Flashover Produced by Tar.** From the established facts that tar leaked from a roof into the room where plaintiff was operating an electric rotary converter and that a flashover occurred, it cannot be inferred (1) that the tar dropped on the machine, (2) from this inference to further infer that the tar ignited and burned into a blaze, there being no evidence that it did, and (3) then from these two inferences to further infer that the blaze from this drop of tar leaped over the space between the rows of positive and negative brushes of the revolving converter nineteen inches apart, thereby furnishing a conductor for the electricity from the one to the other—especially where the evidence discloses that flashovers may be occasioned by many known causes and often from causes unknown.

Appeal from Jackson Circuit Court.—*Hon. Thomas J. Seehorn,* Judge.

REVERSED.

*John H. Lucas* and *Warner, Dean, McLeod & Timmonds* for appellant.

(1) The petition does not state facts sufficient to constitute a cause of action. At the commencement of the trial the defendant objected to the introduction of any evidence, on the ground that the petition does not state facts sufficient to constitute a cause of action. At the close of the case defendant demurred to the evidence; also asked a peremptory instruction for a verdict in its favor. After verdict defendant filed motion in arrest of judgment, one of the grounds therein being that the petition does not state facts sufficient to constitute a cause of action. So the sufficiency of the petition was duly challenged throughout the case. Where a petition does not state facts sufficient to constitute a cause of action its insufficiency is not waived by answering nor cured by verdict. R. S. 1909, Sec. 1804; Welch v. Bryan, 28 Mo. 30; White v. Railroad, 202 Mo. 561; Hubbard v. Clavens, 218 Mo. 621. The test by which to determine the sufficiency of a petition, after verdict, is whether a general demurrer thereto would lie. If so, it must be held insufficient. Rodgers v. Ins. Co., 186 Mo. 255. Before the petition could be held good, it would be necessary for it to allege: (1) that tar made the place or the machinery abnormally unsafe; (2) that defendant knew, or by the exercise of ordinary care would have known, that tar would make the place or the machinery abnormally unsafe. Note, 41 L. R. A. 38; Mueller v. Shoe Co., 109 Mo. App. 517; Railroad v. Kellogg, 94 U. S. 469; O'Keefe v. Box Co., 66 Conn. 38. Due care or negligence cannot be settled by one incident or hypothesis. Chrismer v. Tel. Co., 194 Mo. 209. Nor does mere concurrence of negligence and injury make defendant liable. Warner v. Railroad, 178 Mo. 134. (2) Tar was not shown to be the proximate cause of the accident; therefore, defendant's demurrer to the evidence should have been sustained. Plaintiff proved that tar had been dropping through the cracks of a concrete roof for some time prior to the accident, and that defend-

ant had knowledge thereof; but the mere concurrence of negligence and injury does not make the defendant liable. Warner v. Railroad, 178 Mo. 134. He failed to prove that such tar made the place or the appliances unsafe or abnormally dangerous, or that defendant knew, or ought to have known, that such tar would make the place or appliances unsafe or abnormally dangerous. It was necessary for him to make such proof before he would be entitled to recover. Mueller v. Shoe Co., 109 Mo. App. 517; 41 L. R. A. 38; Railroad v. Kellogg, 94 U. S. 469; O'Keefe v. Box Co., 66 Conn. 38. He also failed to prove that tar was the proximate cause of his injuries. He did show that electrical sparkings and flashovers, similar to those occurring at the time of the accident in question, were produced from many known causes, also from many unknown causes. No witness saw, or undertook to say, what it was that caused the electrical sparking or flashover which burned plaintiff. Where an accident might have resulted from more than one cause, the evidence must not leave the real cause for conjecture. Goransson v. Mfg. Co., 186 Mo. 307; Purcell v. Shoe Co., 187 Mo. 288; Warner v. Railroad, 178 Mo. 134. Where any injury may have resulted from either of several proximate causes, it is for plaintiff to show "with reasonable certainty," that the cause alleged, and for which defendant would be. liable, is the one which produced the result. Warner v. Railroad, 178 Mo. 134; Goransson v. Mfg. Co., 186 Mo. 300; Purcell v. Shoe Co., 187 Mo. 276; Trigg v. Land Co., 187 Mo. 227; Browning v. Railroad, 106 Mo. App. 729; Shore v. Bridge, 111 Mo. App. 278; Candle v. Kirkbride, 117 Mo. App. 278; Thornberry v. Mining Co., 126 Mo. App. 660. Plaintiff, who had charge of machine No. 2, on which this flashover occurred, was the only person in position to have known or discovered whether or not tar was the proximate cause of his injuries. He

testified that he made an effort to ascertain what it was which was causing this sparking, but was unable to do so, and expressly stated that he did not see any tar. At the time of the flashover he was engaged, with his finger and thumb on the brushes, trying to press them down against the surface of the commutator, and his position was such that he could, and did, see both sides of the brushes, as well as the top thereof, and yet he saw no tar there. And nobody, either before, at the time of, or after the accident, saw any tar on the brushes, from which the sparking and flashover originated, nor on the revolving commutator on which the brushes rested. (3) Who can believe that a quantity of tar, if any there was, so small that it could not be seen by plaintiff when making his investigation, could, by going through a fire, become so multiplied as to make fifty or sixty or seventy specks as large as a garden pea? Viewed in the most charitable light, it may be that Dr. Baird saw a number of dark specks which he took to be tar, but was honestly mistaken. An honest mistake in that regard reconciles his statements with the other facts. Viewed in any other light, his testimony is so irreconcilable with all other facts, oral and physical, appearing in the case, that no one is justified in giving it credence, and it must be treated "as not amounting to any substantial evidence of the facts to which it relates," and will be disposed of by the court "as if the witness had not spoken." Weltmer v. Bishop, 171 Mo. 116; Oglesby v. Railroad, 177 Mo. 296; Champagne v. Hamey, 189 Mo. 726. (4) Where an injury may have resulted from either of several proximate causes, it is for plaintiff to show "with reasonable certainty," that the cause alleged and for which defendant would be liable, is the one, which produced the result. Warner v. Railroad, 178 Mo. 134; Goransson v. Mfg. Co., 186 Mo. 307; Purcell v. Shoe Co., 187 Mo. 288; Trigg v. Land Co., 187 Mo. 227; Browning v. Railroad, 106 Mo. App. 729; Shore

v. Bridge, 111 Mo. App. 278; Candle v. Kirkbride, 117 Mo. App. 412; Thornberry v. Mining Co., 126 Mo. App. 660. Where the accident might have resulted from more than one cause, the evidence must not leave the real cause for conjecture. Goransson v. Mfg. Co., 186 Mo. 307; Purcell v. Shoe Co., 187 Mo. 288; Warner v. Railroad, 178 Mo. 134. (5) It does not appear that defendant knew, or ought to have known that tar might, could or would produce flashovers; therefore defendant's demurrer to the evidence should have been sustained. 21 Am. & Eng. Ency. Law, 486; Glover v. Bolt & Nut Co., 153 Mo. 327; Chrismer v. Tel. Co., 194 Mo. 208; Warner v. Railroad, 178 Mo. 134; Fuchs v. St. Louis, 167 Mo. 646; Chandler v. Gas Co., 174 Mo. 329; Railroad v. Kellogg, 94 U. S. 469.

*Botsford, Deatherage & Creason* for respondent.

(1) The petition states a good cause of action. It alleges that tar had been falling on the machines in the power house where plaintiff was working, for weeks before the flashover which produced the injuries to plaintiff; that defendant had knowledge of this fact; that plaintiff called especial attention to his superior officer, the chief electrician, to that fact; that defendant was negligent in permitting the tar to continue to fall from the roof on the machinery; that the negligence of the defendant in failing to repair the roof and in permitting the tar to fall upon the machinery, caused the flashover on one of its machines and as a direct result thereof plaintiff received the injuries complained of. The defendant answered over to that petition, without filing a demurrer thereto and without filing a motion to make the same more definite and certain. Therefore the petition was good. Even a general allegation of negligence is good after answer is filed, and especially after verdict. R. S. 1909, Sec. 2119; Droshagen v. Railroad, 186 Mo. 263; Rodgers v. Ins. Co., 186 Mo. 255; Meier v. Butcher, 197

Mo. 91; Ball v. Neosho, 109 Mo. App. 689; Mueller v. Shoe Co., 109 Mo. App. 514; Conrad v. De Montcourt, 138 Mo. 325; Mack v. Railroad, 77 Mo. 232; Shaw v. Railroad, 104 Mo. 656; LeMay v. Railroad, 105 Mo. 370; Cobb v. Railroad, 149 Mo. 145; Van Cleve v. St. Louis, 159 Mo. 579; Dwerest v. Stamping Co., 163 Mo. 620. (2) It is a matter of common knowledge that tar is inflammable, and an electrician, and particularly the chief electrician of a great electric railway company, should and does know that a flame is a conductor of electricity and that a flashover of the commutator is dangerous to employees who might come in contact therewith. Plaintiff actually warned the chief electrician that it was dangerous for tar to fall on the machinery. (3) Plaintiff put in proof all of the things that may cause a flashover on an electrical dynamo or commutator, and then produced proof negativing every possible cause except the burning of tar. That was more than the law requires. Trigg v. Land Co., 187 Mo. 288; Dunphy v. Stock Yards Co., 118 Mo. App. 512; Powell v. Railroad, 125 N. C. 370; Ray v. Poplar Bluff, 70 Mo. App. 252; Kelly v. Railroad, 70 Mo. 604; Byerly v. Light Co., 130 Mo. App. 593; Settle v. Railroad, 127 Mo. 141; Cambron v. Railroad, 165 Mo. 558. (4) Plaintiff proved affirmatively and conclusively that the flashover was caused from the burning of tar from the very brush which he was trying to adjust. The proof was ample and sufficient under the law. See authorities under point 3. (5) The trial court did not err in overruling defendant's demurrer to plaintiff's evidence. Buesching v. Light Co., 73 Mo. 231; Toohey v. Frevin, 96 Mo. 109; Soeder v. Railroad, 100 Mo. 681; Connoly v. Press Co., 166 Mo. 463.

GRAVES, P. J.—Action for personal injuries. Verdict and judgment for plaintiff in the sum of $10,635, from which said judgment the defendant has

appealed. Matters of pleading and proof to a limited extent can be well stated together. By his petition and his proof it is shown that plaintiff was an experienced electrician working for the defendant at its power house at Fifteenth and Walnut streets in Kansas City, Missouri. In this power house were four electric machines called rotary converters, belonging to defendant, and some others that did not belong to defendant. Plaintiff worked at nights and had charge of the four machines which belonged to defendant. On the night of July 7, 1907, he was severely burned and injured by what is called a "flashover" occurring on machine No. 2, one of the four machines above mentioned. The petition of plaintiff is drawn upon the theory that the disturbance occurring in machine No. 2 on that night was produced by tar which had leaked through the roof of the building. The negligence is thus charged in the petition:

"That said flashover, blaze, explosion and arcing were caused by tar negligently permitted by defendant to leak through the roof of said building and drop upon said electric machinery. That said tar had been leaking through said roof on different parts of machinery in said power house and on the frame work of said machinery and on the floor of said power house for six or eight weeks, and that defendant knew of said tar leaking through on said machinery and in said power house, or by the exercise of ordinary care could have known the same, and that it was the duty of defendant to have prevented the leaking of said tar on said roof through the same and upon said machinery and in said power house; the attention of defendant's foreman, vice-principal and manager, whose duty it was to keep said roof in repair and order, had been called to said leaking of said tar five or six weeks prior to the injuries complained of herein; that said foreman, vice-principal and manager had been requested to repair the same to prevent said leaking of

said tar and had been warned that failure to do so would probably cause damage to said machinery; that said defendant's said foreman, vice-principal or manager whose duty it was to keep said roof in repair, promised to repair the same, but notwithstanding said promise and notwithstanding the fact that his attention had been specially called to said leaking of said tar from said roof on said machinery and in said power house, said foreman, vice-principal and manager, negligently failed to repair the same and negligently permitted it to remain in that leaky condition, and permitted said tar to continue to leak and drop upon said electric machinery and that said tar did continue to leak and drop upon said electric machinery and upon said rotary converter and appliances thereto and therewith connected; that said accident was caused by the carelessness and negligence of the defendant's foreman, vice-principal and manager in permitting said tar to continue to leak through said roof, to continue to drop upon said rotary converters and the appliances thereto and therewith connected and upon said machinery and in not repairing said roof and preventing such tar falling on said rotary converters and said appliances thereto and therewith connected and causing said flashover, blaze, explosion and arcing.''

The answer is (1) a general denial; (2) an affirmative plea of contributory negligence, and (3) assumption of risk. Reply was a general denial. Such is the general outline of the case. Questions raised will require some elaboration of the facts, but this will be done in connection with the points made.

I. Defendant challenges the sufficiency of plaintiff's petition, in this, that it is urged that the petition fails to aver that the leaking upon the machinery rendered such machinery dangerous to those operating it. The petition avers that defendant's foreman had been

warned of the leaking tar and had been requested to repair the roof so as to prevent such leaking. The petition also avers that said foreman "had been warned that failure to do so would probably cause *damage* to said machinery." There is no express averment in the petition to the effect that dropping tar would render such machinery dangerous to those using it, or would probably make it dangerous to use it in the usual and ordinary methods. Nor is there any allegation that defendant knew or might have known that tar falling upon the machinery would render it dangerous to operators.

If the petition states no cause of action at all, then the question can be raised here for the first time. In this court such is horn-book law. On the other hand, if the petition defectively states a cause of action, and such petition is not attacked by motion or demurrer below, as is true in this case, then such petition will be held good after verdict. [R. S. 1909, Sec. 2119.]

There is some unfortunate language used in the petition as above indicated. Not only so, but there is absence of some material allegations, but we are further impressed with the view that the petition defectively states a cause of action, rather than with the view that it states no cause of action. The line between the two classes of petitions is at times hard to draw, and this petition presents one of the hard cases, but as above stated we think it is a petition which falls under the broad protecting wing of the statutes cited. The petition does allege that plaintiff was injured by reason of a "flashover." It does allege that the "flashover" was occasioned by tar dropping on the machinery, and that such dropping of tar was negligently permitted by the defendant. Under our very broad saving statute, we feel constrained to hold the petition good after verdict. In this contention the defendant is therefore overruled.

II. The crucial point in this case is the sufficiency of the proof. It is clear that before plaintiff should be permitted to recover, his proof must show (1) that his injuries resulted from a "flashover," (2) that such "flashover" was occasioned by tar falling upon machine No. 2, (3) that tar was negligently permitted so to fall by the defendant, and (4) that defendant should reasonably have anticipated that its negligent act would occasion injury to its operators. The proof does show that plaintiff's injuries were the result of a "flashover," and it further tends to show that tar had been leaking through the roof in places. This is as far as the proof in direct terms goes.

Going now to the details. The commutator continually and rapidly moves. Its face comes in contact with twelve rows of brushes of eleven brushes each. These alternate as to the character of the current passing through them. One row contains brushes through which the positive current passes and the next row brushes through which the negative current passes. These rows were about nineteen inches apart, as we gather it. The brushes are a carbon compound, so made as to be pressed closely to the moving surface of the large wheel or commutator. The brush is held in place by a holder and is kept pressing against the commutator by a spring. A slight raising of the carbon brush from the face of the commutator will cause what is denominated "sparking." A "flashover" is a passing over of the current from a positive brush to the negative brush. This brush fits closely in the holder, but can be pushed up and down in the holder. On the night in question plaintiff observed a sparking from one of the brushes. He first took a stick and undertook to press the brush up against the commutator. This failing, he got a board upon which to stand, and then undertook to remedy the matter with his hands. Whilst so doing the "flashover" oc-

curred and he was injured. He says that he saw no tar on the machinery, although there is evidence that there was tar at some point on the base upon which the commutator stood. No witness testifies to there being any tar upon the machine itself. Under the evidence tar itself is a nonconductor of electricity. On the other hand a blaze is a conductor. Plaintiff's theory seems to be that tar had dropped upon the machine and was lighted by the "sparking" and the blaze thus created furnished the conductor which occasioned the "flashover," yet no witness testifies to a "flashover" being occasioned by tar.

Realizing the necessity to show the presence of tar, the plaintiff introduced one Dr. Thomas C. Baird. The testimony of this witness is so remarkable, considering the physical facts and other testimony in the case, that we draw heavily therefrom. The witness graduated in medicine in 1866, so he says. He also says that his work "has been largely in the United States pension line, as pension surgeon." Describing plaintiff's wounds he says:

"Q. In what condition did you find him then, Doctor, just describe his condition fully? A. Well, I found him one of the worst burned men I ever found in my life.

"Mr. Timmonds: We object to that answer, and move to strike it out as irrelevant.

"The Court: Objection sustained.

"A. (Continuing.) Well, he was burned about the face, and ears, and chest, and forearms.

"Q. How about his hands? A. They were burned badly.

"Q. What condition were his eyes in? A. His eyes were closed, swollen shut, that is, his eyelids. Not his eyes proper.

"Q. What condition were his face and lips in? A. His lips was one black charred mass, his face and lips.

"Q. What was the condition of his ears? A. The same, the right ear especially.

"Q. Which of his ears was the worst burned? A. The right ear.

"Q. What condition were his arms in? A. His forearms, more properly speaking, were very seriously and deeply burned."

After thus depicting the scope of the burns, and warming up to the subject of tar, he continues:

"Q. Doctor, what, if anything did you find on Mr. Sexton—and where did you find it—at the time you examined him after he was burned? A. Are you speaking now, with reference to tar?

"Q. I am asking you, Doctor. A. I found some specks of tar on the upper portion of his chest.

"Q. What was it you found? A. Speck of tar.

"Q. Are you able to determine that it was tar, Doctor? A. Well it looked like it and smelled like it. I didn't taste it. There was no tar in any great quantities; but there were specks of tar the size of a pea plastered all over his arms; and there was evidently the same thing on his face."

Falling a little under the rapid fire of cross-examination, the witness in rather subdued tones further speaks of tar, thus:

"Q. Doctor, the only present evidence of the burn received by Mr. Sexton are these manifested by his hands, at this time? A. Yes, sir; as far as I know.

Q. Can you tell the jury, Doctor, that you discovered some specks of something dark on Mr. Sexton, on the upper part of his chest? A. Yes, sir.

"Q. Was the skin on the upper part of his chest burned, Doctor? A. Yes, sir; very much burned around there (indicating on chest).

"Q. How far down did that burn go on his chest? A. It didn't extend below the clavicle, the collar bone.

"Q. It didn't go below the collar bone? A. It was a little charred, here (indicating); but nothing serious, to amount to anything.

"Q. Nothing serious below the collar bone? A. No, sir.

"Q. Now, what color was the skin where it was burned, up about the neck? A. There was a certain amount of darkness and blackness, which there is always in severe burns.

"Q. Did it seem to have the appearance of a powder burn, look something like a burn from the flash of powder? A. No, it didn't look to me like a powder burn.

"Q. I am not trying to get you to testify that it was a powder burn; but I am trying to get you to— A. (interrupting) Well, it looks to me like a combination of tar and sulphurous fumes.

"Q. I am trying to get you to tell the jury how it looked, Doctor? A. Well, it looked about as black as your hat.

"Q. About as black as tar? A. Yes, sir.

"Q. The whole surface of the burn looked that black, did it? A. Yes, sir.

"Q. And that was true on his face? A. Yes, sir; true of his face.

"Q. Now did the skin possess a charred appearance? A. I don't believe I would make use of that word "charred" exactly.

"Q. You did use it, in your direct examination. A. It was more of a crisp. Well, charred and crisp are about the same thing.

"Q. What do you mean, "charred" or "crisp?" A. I mean charred.

"Q. Then you intended to use it a while ago? A. I don't think there is any better term to express it.

"Q. Did anybody suggest to you that you look for tar? A. There was no suggestion of that kind made to me.

"Q. Mr. Sexton didn't make any suggestion of that kind? A. He did not.

"Q. Did the burn on Mr. Sexton's upper chest and face—was it sufficient, so you could smell it? A. Now, look here. I don't know that I could smell anything especially.

"Q. You didn't smell that? A. Not especially. We used on it soap and water, and warm water; and we didn't—

"By Mr. Deatherage (interrupting): Speak louder, Doctor. A. (continuing.) We didn't use anything but castile soap and warm water. We didn't have any smell in there—no unpleasant odor.

"Q. (By Mr. Timmonds, resuming): Now, you discovered some specks you say? A. Yes, sir.

"Q. On the upper part of Mr. Sexton's chest? And by that you mean above his collar bone? A. Yes, sir.

"Q. And on his face? A. Yes, sir.

"Q. Which you tell the jury you took to be tar? A. Which I took to be tar.

"By Mr. Deatherage (interrupting): A little louder, please, Doctor. A. I took it to be tar.

"Q. (By Mr. Timmonds, resuming): On top of the burn, or under the burn? A. As presented to the surface.

"Q. Then on top of the burn? A. Yes, sir, on the visible observation.

"Q. Then, it came there after the burn? A. I presume it occurred just at the time of the burn.

"Q. How large was the specks that you refer to? A. Well, now, I don't think they were any larger than a pea.

"Q. Do you think there were any of them that large, Doctor? A. Well, like shot, if that is any difference.

"Q. What number of shot? A. I never counted them.

"Q. I say what size or number of shot do you refer to? A. I never counted them. I think there were quite a number.

"Q. You said that some of those specks were as large as shot? A. Yes, sir; I am positive they were.

"Q. What number of shot, Doctor? A. I can't say.

"Q. You can't say that, either? A. (Hesitating) I should say fifty or sixty.

"Q. You mean fifty of sixty specks? A. Yes, sir.

"Q. What I am trying to get at, is— A. (Interrupting): The size of the spots?

"Q. You told the jury that some of the specks were the size of shot? A. Yes, sir; I think so.

"Q. Now, what number or size of shot do you refer to, when you use that expression? A. Oh there were fifty or sixty, or seventy of them.

"By Mr. Deatherage: He means the size of the shot, Doctor? A. Some of them were the size of shot, and some of them were the size of a pea.

"Q. (By Mr. Timmonds, resuming): Over what space did it cover—these specks? A. The anterior upper portion of the chest.

"Q. The upper portion of the chest—but, how far to the side did they extend? A. It extended as far as the shoulders—the extra process, we call it, and around here (indicating on body).

"Q. That is about half way between the chest and the shoulder point? A. Yes, sir.

"Q. On each side? A. Yes, sir.

"Q. And down to the collar bone? A. Yes. Above and below, largely above, mostly above the collar bone.

"Q. And where a man's shirt is ordinarily fastened? A. And back here (indicating), it was kind of skinned.

"Q. Did you discover any of these specks below where an undershirt is ordinarily fastened at the neck? A. No, sir.

"Q. Then, what did you mean when you told the jury you discovered them all over his chest? A. I mean, an undershirt that comes to about this point (indicating on body).

"Q. Then, use the words that you mean, so that the stenographer may take them down? A. Well, I mean an undershirt, an undershirt reaching from the anterior and superior portions of the chest.

"Q. That is what I want to get. If you found any specks there, Doctor, they probably came there while the flesh was uncovered? A. It happened right at the time he was burned.

"Q. I know. But, I mean if there was any specks plastered on him, they were plastered on the flesh itself? A. Yes, sir; that part that was exposed.

"Q. What I am getting at, trying to get at, if you are competent to answer— A. (Interrupting) I will answer you if I can.

"Q. (Continuing)—Is whether the specks which you discovered would probably go through a fleece-lined undershirt? A. I don't hardly think so.

"Q. You don't hardly think so? A. A fleece-lined undershirt? No, sir. That is a pretty good texture.

"Q. I don't understand you? A. A fleece-lined undershirt is a pretty firm texture.

"Q. You say that your practice has been particularly in the position of a pension examiner? A. Yes, sir; a United States pension examiner.

"Q. For what length of time? A. Fifteen years.

"Q. You haven't been engaged in any practice during that time? A. No. But I don't refuse any calls. Sometimes they are poor people.

"Q. Have you been engaged in the general practice of medicine during that time? A. Yes; I never took my sign down.

"Q. Where is your office? A. I make my office up at the post office building. They furnish me that office, free.

"Q. Your doctor's office, then, is in the United States post office building? A. Yes, sir; room 405."

The accident occurred in the early morning of July 8, just after midnight. Two other physicians made a careful examination of the plaintiff on July 20, following. They give no evidence as to tar. They do say that the flesh was burned deeper in some places than in others. That the testimony of Dr. Baird is but the exuberance of an overdrawn imagination is made clear by all the other testimony in the case, and especially that of the plaintiff himself. Plaintiff says that when he noticed the sparking from this one brush, he examined it critically to discover the trouble. He saw no tar. It is hardly probable that tar, which could not be seen or discovered by the plaintiff, existed in such quantities as to produce the result described by the doctor. Plaintiff also says there were no flames from the "sparking" prior to the "flashover" which burned him. It must be remembered that tar itself is a nonconductor. That the only way it could be a conductor would be to ignite the tar, and the flames would be conductor, not the tar itself. Plaintiff also says that burning tar gives out a strong odor, and he noticed no fumes or odors at that time. The source of the drops of tar was from the roof, which roof is thus described by the plaintiff. "Q. What kind of roof did it have? A. A cement or granitoid roof, covered with tar paper. It had been tarred." Through this roof the tar had been leaking in drops at different portions of the building. In some places the leaking was worse than others, but no leaking was shown as to machine No. 2, except upon the base upon which the machine was erected. Even if it be granted that a drop of tar struck the brush upon which the plaintiff was working, yet it is too unreason-

able to be believed to say that after it had been reduced to a flame in order to produce a conductor between the positive and negative brushes nineteen inches apart there would still be enough left to bespeck plaintiff's burnt face and hands as described by this witness. The evidence shows that it required the destruction of the tar by reducing it to a flame, before there could be a "flashover" from tar. This is not only the evidence, but it is scientific knowledge, yet we find the imagination of this witness going beyond and in the face of both. Large sums of money should not be taken from the pocket of one person and placed in the pocket of another by the judgment of a court, upon such testimony, contradicted as above indicated. No legal rule can stifle the conscience of a court when it comes to deal with testimony of this character. No court should be bound by testimony demonstrated to be false by all other facts in the case, and further demonstrated to be false by our own common knowledge of scientific facts. Under the evidence and under scientific principles it required the destruction of the tar in order to furnish the conductor or medium of the "flashover." Such is not consistent with sixty to seventy particles of tar the size of a pea or shot after a "flashover" and all from a drop of tar from the roof, which drop could not be discovered by one who was looking for the trouble. Upon our duty in a case of this kind, this court, in Weltmer v. Bishop, 171 Mo. l. c. 116, said:

"From this it will be seen that the court submitted to the jury to say if plaintiffs' business was legitimate, and in weighing that question they were to consider the results as disclosed by the evidence, and on the whole, if the results had been beneficial, the business was not to be adjudged a fraud.

"Courts are not such slaves to the forms of procedure as to surrender their own intelligence to an array of witnesses testifying to an impossibility.

They are not required to give credence to a statement that would falsify well-known laws of nature though a cloud of witnesses swear to it. We recognize that in the realm of science much is yet undiscovered, and especially is this so in the science relating to diseases of the human system and their treatment. Different schools of medicine contend with each other on vital questions, and as long as the contest continues with reason it can not be said that the right of either as above the other has been demonstrated. But if either school would convince us that it is right or even that it is entitled to be recognized as a contestant, it must appeal to our intelligence and discuss the sub-ject on the basis of natural laws. If it cannot be discussed on that basis, there is nothing to discuss. If a man comes into court claiming to possess supernatural powers and brings with him witnesses who swear he has done for them that which we know is impossible, we are not required to believe such evidence. Here was a woman, who perhaps believed what she said, who testified that by a mental process of one of these plaintiffs, transmitted to her through a letter several hundreds of miles away, she was entirely cured of a cancer of the breast. The fact that the plaintiff, who was supposed to have transmitted the influence from Nevada, was not there at the time, does not add to the absurdity of the statement. And the testimony of other witnesses, perhaps also sincere, to the effect that they were cured of otherwise incurable diseases by such mysterious process can have absolutely no lodgment in our intelligence.

"Under the instruction above quoted the jury were directed to heed such evidence and if, on the whole, it showed that good had resulted to the community from the practices of the plaintiffs, the jury were to find that the business was a lawful one. It was an instruction in effect directing the jury to sur-

245 Mo.—18

render their own intelligence to the preponderance of statements of witnesses, irrational though such statements were. Under the conceded facts there was no evidence to justify the submission of the case to the jury, and the peremptory instruction for a verdict for the defendant should have been given.''

So, to, in another civil action for damages, Champagne v. Hamey, 189 Mo. l. c. 726; discussing a similar situation, this court said:

''To entitle plaintiff to recover in this action it must be shown by some substantial evidence that the defendant, by force and violence and against her will, ravished her. We have read in detail all the evidence introduced upon the trial of this cause, and after a careful consideration of it we are unable to escape the conclusion that the verdict should not be permitted to stand.

''The statements of plaintiff as to this occurrence must be viewed in the light of all the surrounding facts and circumstances. If the physical facts and all the circumstances appearing in evidence, together with the surrounding conditions, absolutely negative and destroy the force of such statements, then, in contemplation of law, such statements do not amount to any substantial evidence of the facts to which they relate. We do not mean by this that the prosecutrix must be corroborated, for such is not the law of this State. [State v. Marcks, 140 Mo. 656.] But we do hold that statements made by a witness that are, not only in conflict with the experience of common life and of the ordinary instincts and promptings of human nature, but negatived as well by the conduct of the witness, and the conditions and circumstances surrounding the occurrence to which they have application, are not sufficient to support the grave and serious charge of rape, and this is true whether the charge is made in either a civil or criminal proceeding.''

We omitted some further facts. Plaintiff says that the "flashover" was as big as a half barrel. His language is: "The electrical flame burst out through the air as big as a half barrel, and enveloped my head and arms inside this electrical flame." This carbon brush was fastened to the holder by a small copper wire called a "pig-tail." After the accident the brush was picked up from the floor. The wire had been burned in the middle, or there about. No evidence as to tar was found upon this brush, or upon the commutator. Under these facts and circumstances, we say in this case on the question of tar as detailed by Dr. Baird, as we did in the Champagne case, supra, "such statements do not amount to any substantial evidence of the facts to which they relate."

In this case the plaintiff relied upon a specific charge of negligence. The law imposed upon him the duty to prove that dropping tar occasioned the injury. The proof does not sustain the charge, and his verdict and judgment cannot be permitted to stand.

III. But there is another substantial reason for reversing this judgment. Under the law inferences are allowed to be drawn from facts proven, and logical inferences thus drawn, will uphold a verdict. You cannot, however, base an inference upon an inference to sustain a verdict. As said by Goode, J., in Trotter v. Railroad, 122 Mo. App. l. c. 415: "Such presumptions of fact (properly called inference) are not to be piled up indefinitely." So too this court has ruled in Yarnell v. Railroad, 113 Mo. 580, whereat we said: "Again, we are asked to presume that the deceased was in the exercise of due care. This presumption is evidently invoked in order that if 'due care' be presumed on the part of the deceased, that it may then be presumed that the defendant was guilty of negligence, or else the accident would not have happened.

But it is not allowable to build one presumption on another, and thus make a cause of action.''

In the case at bar we have as proven facts, (1) a roof from which tar was dropping or leaking, and (2) that it had dropped or leaked in different portions of this building. These are the established facts. From these facts we are asked to infer (1) that tar dropped on machine No. 2 (because there is no proof that it did), and (2) from this inference to further infer that such tar ignited and burned into a blaze, although there is no proof that it did (the large blaze spoken of by plaintiff, supra, being an electrical blaze) and (3) then we are to infer that this blaze from a drop of tar leaped over the space between the positive and negative rows of brushes—a distance of eighteen or nineteen inches—thereby furnishing a conductor for the electrical current. It is simply piling one inference upon another, and all this in the face of the fact that no witness had ever known of a ''flashover'' occasioned by tar. It is true that any substance between the brush and commutator would produce ''sparking.'' ''Sparking'' is but the short jump of electricity from one object to another, or a slight break in a simple current. A ''flashover'' differs in that it is the passage of the positive current over to the negative.

From this standpoint of the law the record fails to disclose a case for the plaintiff.

IV. But beyond all this the evidence discloses that ''flashovers'' may be occasioned by many known causes, fully detailed in the evidence, and further discloses that they often happen from causes unknown. Under the evidence electricity possesses many eccentricities, and this we know without evidence. ''Flash overs'' may be occasioned by things which happen with the machinery within a building, or they may be occasioned in the machinery of a given building

when the cause of the "flashover" was a long way distant from the building.

We cannot say under the record before us that plaintiff has shown that his injuries were occasioned by tar negligently permitted to drop upon the machinery with which he was working. It follows therefore that the judgment in this case should be reversed, and it is so ordered. All concur.