MAX HOSHEIT, Respondent, v. JAMES W. LUSK, W. C. NIXON, and W. B. BIDDLE, Receivers of the Saint Louis and San Francisco Railroad Company, Appellants.

Springfield Court of Appeals, June 17, 1915.

1. **MASTER AND SERVANT: Personal Injuries: Evidence: Demurrer.** Action by a coach carpenter for injuries received while operating a "jointer" in defendant's shop. Evidence reviewed and defendant's demurrer considered properly refused.

2. ———: ———: ———: Negligence: Contributory Negligence. Action by a coach carpenter for injuries received while operating a "jointer" in defendant's shop. Evidence considered and *held* to make the question of plaintiff's contributory negligence one for the jury.

3. INSTRUCTIONS: Negligence: Submitting Question Not Pleaded: Error. An instruction which submits a ground of negligence not covered by the petition is fatally erroneous.

4. PLEADINGS: Purpose of Petition: Definiteness. The chief purpose of a petition is to inform the defendant of the facts which constitute the cause of action in such definite and precise terms that defendant will know what facts the plaintiff will prove in order that defendant may prepare to meet them.

5. INSTRUCTIONS: Within Issues, When: Negligence. Action by servant against master for injuries received while operating a "jointer" in defendant's machine shop. The negligence complained of was that the master permitted the tables to become unbalanced and lower at one end than at the other. The evidence showed that instead of the table being balanced and level as it should have been it would tilt at one end and become lower than at the other and was unstable. An instruction given for plaintiff submitted the specific ground of negligence that defendant "failed to exercise ordinary care to keep its table balanced and level so as not to tip or wabble when being used." The instruction was within the issues.

6. MASTER AND SERVANT: Negligence: Assumption of Risk. A servant never assumes a risk occasioned by the master's negligence.

7. ———: ———: Contributory Negligence. A servant who knows of the defects due to the master's negligence and appreciates the dangers arising therefrom is guilty of contributory negligence which bars his recovery only when the danger is so obvious and glaring that an ordinarily prudent person would not undertake the work in the face of such danger.

8. ———: Negligence: Assumption of Risk: Missouri Decisions Differ from Federal. There exists a difference of law as to assumption of risk between the decisions of the courts of Missouri and those of the Federal courts.

9. ———: Negligence: Assumption of Risk: Federal and State Decisions. Even in cases arising under and governed by the Federal act relating to employer's liability when engaged in interstate commerce, the courts of Missouri are not bound to apply the rule of law concerning assumption of risk as established by the Federal courts, but apply their own rules as to assumption of risk.

10. **MASTER AND SERVANT: Tools and Appliances: Standard as to Safety.** A master is not required to furnish for the servant's use the safest and best appliance, nor is he convicted of negligence on a mere showing that a safer appliance might have been used. It suffices if the instrumentality actually furnished is reasonably safe for the purpose and in the manner intended to be used.

11. ————: ————: **Safe Appliances: Comparisons.** Action by servant for injuries received while using a jointer in defendant's machine shop. Plaintiff was permitted to introduce evidence relating to comparative safety between the machine used and another jointer in the shop. Considered not reversible error under the facts set out.

12. ————: ————: ————: **Evidence: Comparisons.** To assist in determining whether or not a certain appliance furnished by the master was reasonably safe, evidence tending to show that a safer appliance might have been used is admissible. It is not permissible to set up as a standard of negligence the fact that a safer appliance could have been furnished.

13. **DAMAGES: Excessive Verdict: Remittitur.** Action for personal injuries. Verdict for $10,000, voluntarily reduced to $7500. Circumstances considered, the verdict is held excessive to any amount above $6000. [ROBERTSON, P. J., dissenting.]

Appeal from Lawrence County Circuit Court.—*Hon. Carr McNatt*, Judge.

AFFIRMED (*conditionally*).

*W. F. Evans* and *Mann, Todd & Mann* for appellants.

*Fielding P. Sizer* for respondent.

STATEMENT.—By this suit plaintiff sought to recover damages on account of the loss of four fingers on his left hand while engaged in operating a "jointer" in the machine shops of the defendants at Springfield, Missouri. The case was tried in the Lawrence county circuit court, resulting in a verdict for plaintiff for $10,000. On the day the verdict was returned defendants filed a motion for new trial assigning as one of the grounds that the verdict is excessive and the plain-

tiff voluntarily remitted $2500 and the court entered judgment for $7500. The defendants have appealed.

Plaintiff was employed as a coach carpenter. In repairing a steel baggage car he desired to use sufficient boards thirty-two inches long and one inch thick to cover a space seven feet by thirty-two inches. He ordered this material from the foreman of the mill room. The material was got out in the mill room and delivered to plaintiff at the coach department. When he came to fit the boards to this space he discovered that a post was sprung out about one-sixteenth of an inch and in order to make the boards fit it was necessary to cut or "joint off" of one end of them one-sixteenth of an inch for a distance of six inches. Plaintiff, with his helper, carried the boards from the carpenter department into the mill room. The plaintiff adjusted the machine, called a "jointer," to cut approximately to this depth and while attempting to joint off the one-sixteenth of an inch from the first board it was knocked out of his hand by the action of the knives thereon and his fingers were caught by the knives and cut off. This jointer is a machine composed of two metal tables known as the front table and the back table. These two tables, each about ten inches wide and three or four feet long, form a continuous table except there is a space of some three to five inches between them wherein revolves the "head," which is a cylinder slightly longer than the width of the table with four knives attached to it and which revolves very rapidly, something over three thousand revolutions to the minute. The machine, or head, is operated by power supplied by a long belt, causing considerable vibration during its operation.

In operating this machine the front table is adjusted slightly lower than the circle of the knives while the back table is on a level therewith. The difference in height between the front and back tables is the amount to be cut or jointed off the board. The oper-

ator stands at the front table, places the board flat thereon and with his left hand pressing down on the board near the end next to the revolving knives or head he pushes or slides the board forward with his right hand until it engages the knives which revolve towards him and, by further sliding it forward, cuts the required distance. A cut of a machine similar to this one and its general method of operation and construction will be found in Collinsworth v. Zinc & Chemical Co., 260 Mo. 692, 698, 169 S. W. 50. What is there termed the knife block is here termed the head but the head of this machine is round instead of square and has four knives attached instead of two. The manner of plaintiff's injury is alleged in the petition to be that, in order to joint about one-sixteenth of an inch off of the end of said boards, it became necessary, as was the custom, for plaintiff to go into the mill room to the jointer furnished for such work to be performed by plaintiff and other coworkers in and about said shops; that plaintiff, in the exercise of ordinary care, undertook to run one end of the board to be jointed over said revolving knives, in order to cut off about one-sixteenth part of an inch, and in doing so plaintiff placed his left hand on the end towards the revolving knives and his right hand back at the end of said board and pushed said board up slowly on said table towards the revolving knives; that, on account of the defective condition of the table and the knives, said board, as soon as it came in contact with said revolving knives, was suddenly kicked back from under plaintiff's left hand, and such hand was thrown on the revolving knives and all the four fingers thereof were cut off.

The specifications of negligence alleged in the petition on which the case went to the jury are: "In failing to exercise ordinary care to keep said jointer, its knives and tables in reasonably safe repair for plaintiff to work thereon. In negligently permitting the tables to become unbalanced and lower near the head

of said jointer. In failing to exercise ordinary care to furnish braces or supports or attachments on said jointer to hold the board in position when being run over said jointer." There are other specifications of negligence in the petition to which some of the evidence related, but which were abandoned by plaintiff when submitting the case to the jury.

The answer was a general denial, coupled with three special defenses: (1) Contributory negligence in one specified particular, "by allowing said board to come down upon the top of the knives instead of placing it upon the table and pushing it toward the knives;" (2) Contributory negligence due to the fact that "plaintiff voluntarily left the coach department . . . and attempted to work upon the jointing machine in the mill room, which was outside of the scope of plaintiff's employment and which was not a part of plaintiff's duties . . . and which work plaintiff could have had performed by an employee of defendants in the mill room" . . . and plaintiff "was a volunteer and not engaged in the scope of his employment;" and (3) Assumption of risk, on the ground that his injuries were due to the "usual and ordinary risks of the business."

The plaintiff thus described the manner of receiving his injury: That, after he had procured from the mill department the boards necessary to make the repairs on the car on which he was working, he and his helper took the same to the jointer in the mill department. After adjusting and starting the jointer he then turned around and picked up one of the boards and laid it down flat on the table which he had adjusted, and with his left hand placed near the forward end of the board and with his right hand at the back end plaintiff began to push the board over said table towards the revolving knives attached to the cylinder-like head in order to cut or joint off the underside of the end of the board about one-sixteenth of an

inch; that the board was in this manner pushed up to the knives, and, when plaintiff thought the board was at a place where the knives should be cutting, the end of the board was apparently passing over the knives without taking hold and plaintiff bore down upon the front end of this board in order to get the knives to cut and as he did so the table gave down, "tilted or rocked," and the board suddenly struck the revolving knives and was suddenly kicked backward from under plaintiff's left hand and his fingers were caught and cut off by the revolving knives.

It appears that this machine was not used regularly by anyone but was used by the coach carpenters and other employees to do short jobs as the occasion might require. The plaintiff had used it frequently, but not regularly, for some three or four years and other workmen in his line were frequently using it under the eye of the master. It was no part of plaintiff's duty to keep this machine in repair or to see that it was in good working order other than to use ordinary care for his own safety. He says that when he first began using it he told his foreman that he did not understand working it and did not think it was very safe; that he asked to have some one else do for him the work necessary to be done on this machine, but was told that the men in his line of work did their own jointing and that he could operate the machine as well as the others. There is no serious contention but that the evidence fully justified the finding that the plaintiff was allowed and expected, and that it was within the scope of his employment, to use this machine as occasion might require even if, on his refusal to operate the same, another workman might have been supplied to do it for him.

There is evidence, not only of the plaintiff but of other witnesses, that the table on which the board rested while being pushed to and over the revolving knives was not rigid but had become loose on its bear-

ings so that it "tilted or wabbled." One witness said it was "loose and wabbly" at the end on which the operator would place the board; it would work up and down by applying a force of from ten to thirty pounds; "it rocked like." This witness did not think it would wabblè or rock by pressing down on the board near the knives "unless it was something heavy," although he had never tested it that way. The plaintiff said he had noticed that when the table was set to cut a certain depth, it would not stay set but that he would have to set it time and again; that he had noticed that in passing a board over the knives, on bearing down on the last end it would cut deeper. One of defendants' witnesses testified: "As the board would be pushed toward the knives, the knives revolve toward the board. If it came down and the table would tilt some and throw it on the knives so as to make too big a dip so as to kick the board out, it would kick it out in this direction . . . I never reported any difficulty on the machine to the foreman or any of the headmen. I did not find that until after Mr. Hosheit was hurt. I went back to find out if it would tilt and found it did." Another witness said: "I lifted the back end and found it had a tilt of about one-eighth of an inch." There was other evidence to this same effect.

All the witnesses agree, and it is not seriously contested, that if when the board was over or slightly on the knives the table on which it rested suddenly went down an eighth of an inch or less, the knives, by striking the wood deeper, would have a tendency to throw the board from under the hand bearing down on it, resulting in great danger to the hand.

The board which plaintiff was jointing at the time of his injury has been preserved and is before this court. Its physical appearance shows that the knives did not begin cutting at the end of the board, as they should, but cut rather deep and somewhat irregular grooves beginning a fourth of an inch or more from

the end.  The markings on the board positively show that the board came down on the knives from above and over them rather than having the end pushed against them.  The appearance of the board would support plaintiff's theory that when the board was shoved to and slightly over the knives, his pressure down on it caused the table to tilt down at that end and let the board down on the knives; or it would support defendants' theory, "that plaintiff negligently placed the board which he was endeavoring to joint on said machine, by allowing said board to come down upon the top of the knives instead of placing it upon the table and pushing it forward toward the knives." Plaintiff positively denied his negligence in thus handling the board and the jury believed his theory.

The evidence shows, without contradiction, that the jointer in question as originally constructed was provided with certain clamps and springs for holding the boards in place on the table without using the hand to press down on same, but that this appliance had long since been discarded and was not in use at the time of this injury.  As one witness said: "They have springs to hold the board down so you won't have to put your hand on the board, but they are not in use and have not been."

Another defect sustained by the evidence is that there was too much space between the end of the table on which the board was pushed and the revolving knives; that this caused unusual vibrations and was a source of danger to the operator in holding and guiding the board.

## OPINION.

STURGIS, J.—The foregoing statement of the facts and evidence disposes of defendants' contention that a demurrer should have been sustained to the evidence.  There is ample evidence to sustain either

ground of negligence submitted to the jury in plaintiff's instructions, to-wit: "First: Whether or not defendants exercised ordinary care to keep said jointer, its knives and table in reasonably safe repair or condition for plaintiff to perform his work thereon; Second: Whether or not defendants exercised ordinary care to furnish braces, or supports or attachments on said jointer to hold the board in position when being run over said jointer." The defects in the machine thus shown to have existed are clearly the result of negligence of the master. These are not defects which inhere in the machine from its construction and intended manner of use. They are defects due to the failure to repair the machine and keep it operating in the manner it was intended. The evidence does not show conclusively that the plaintiff received his injury from his own act in placing the board over and letting it come down on the knives instead of placing it flat on the table and pushing it towards such knives. Such cases as Smelser v. Railroad, 262 Mo. 25, 170 S. W. 1124, and Sexton v. Railroad, 245 Mo. 254, 149 S. W. 21, are not applicable to the facts here.

All of the defendants' instructions were given and it complains only of instruction numbered two, given for plaintiff, in that it submits to the jury the specific ground of negligence that it failed "to exercise ordinary care to keep its table balanced and level so as not to wabble or tip when being used." The ground of objection is that this instruction thereby submits a ground of negligence not covered by the petition. If so, the error is fatal. [Schumacher v. Breweries Co., 247 Mo. 141, 162, 152 S. W. 13; Black v. Railroad, 217 Mo. 672, 685, 117 S. W. 1142; Allen v. Quercus Lumber Co., 182 Mo. App. 280, 168 S. W. 794.] In determining this point, however, substance and not form must be considered. The same defect or act of negligence may be described or defined by the use of different words or forms of expression. It is significant in this connection

that no complaint is made that the instruction does not follow the proof made, yet, no objection was made to the evidence as proving a ground of negligence not alleged. An amendment might then have been made if necessary. The petition designates the act of negligence in these words: "In negligently permitting the tables to become unbalanced and lower near the head of said jointer." The proof shows that this table should have been kept balanced and level; that instead of being so kept it became unbalanced so that it tilted or became lower near the head or revolving knives, or, as the witnesses said, "wabbled." When substance is regarded, we think that both the petition and instruction sufficiently designated the real defects in the machine and that defendants were not misled. One, if not the only, purpose of a petition is to inform the defendant of the facts which constitute the cause of action in such definite and precise terms that defendant will know what facts plaintiff will prove in order that he may prepare to meet the same. Tested by this rule the allegations of negligence as to the condition of this table are sufficient to warrant the proof made and the instruction given.

The defendant offered to prove that the baggage car on which plaintiff was doing this repair work was one which had been and was intended to be used in interstate commerce. The court excluded the evidence because no such issue was made by the pleadings. We need not discuss this question of pleading. The purpose of introducing the evidence was to lay a foundation for invoking the rule as to the assumption of risk adhered to by the Federal courts in interpreting and applying the Federal Employers' Liability Act, to the effect that a servant assumes not only the risks usual and ordinarily connected with his employment, but also such dangers as arise from defects *due to the master's negligence* where the servant both knows of the defects and that same endangers his safety. [Gila

Valley, G. & N. Ry. Co. v. Hall, 232 U. S. 94, 101, 58 L. Ed. 521, 524.] The rule is expressed in Seaboard A. L. Ry. Co. v. Horton, 233 U. S. 492, 503, 58 L. Ed. 1062, 1070, in this language: ''But risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care with respect to providing a safe place of work and suitable and safe appliances for the work. These the employee is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them.'' The law as to assumption of risk, as firmly established in this State, is that the servant never assumes a risk occasioned by the negligence of the master (Curtis v. McNair, 173 Mo. 270, 73 S. W. 167); and the only effect that the servant's knowledge of defects due to the master's negligence and his appreciation of the dangers arising therefrom has, is found under the rule of contributory negligence that such known and appreciated danger precludes recovery only when the danger is so obvious and glaring that an ordinarily prudent person would not undertake the work in the face of such danger. We had occasion in Hawkins v. St. L. & S. F. R. Co., 174 S. W. l. c. 133, to note this difference in the law of assumption of risk as adhered to in this State and in the Federal courts. We also noted, as we do now, that our Supreme Court, in Fish v. Railroad, 172 S. W. 340, held that the courts of this State are not bound, even in cases arising under and governed by the Federal Act relating to employers' liability when engaged in interstate commerce, to apply the rule of law above stated in regard to the assumption of risk as established by the Federal courts. In cases governed by the Federal Act we apply our own rules of law as to assumption of risk. It makes no difference in this respect, therefore, whether the plaintiff was, or was

not, an employee engaged in work pertaining to inter-state commerce and the rejection of the evidence is harmless.

There was evidence that there was another jointer, similar to the one on which plaintiff was injured, in defendants' shops near the one in question. The defendants predicate error on the following questions and answers relative thereto: "Q. You may state why you didn't use it oftener than you did? A. Well, we had another machine there and of course if I had anything to do, I wanted to do a good job, and I would take it to the other machine. Q. Why would you do that? A. Because it was a better machine and a perfect machine and did good work." The objections made at the time to these questions are that the same are immaterial to any issue in the case. Also, these questions and answers: "Q. Now, when you millmen had this good machine over there, you may state whether or not the shopmen were allowed to use it as much as they were this other one? A. Well, of course there is a point there. You see when they brought that machine there, that new one, the Oliver, of course the cabinet men wanted that; they didn't want anybody else to run that machine; they run it principally. Our millmen run it some, but we did very little jointing as a rule. Q. As a matter of fact you may state whether or not the company had a sign on this good one that you speak of, not to use that, for the coachmen such as Hosheit not to use it? A. It didn't say coachmen, it said 'For machine-men only,' I think. A fellow got cut there and they put that notice up." The objections to these questions are a little broader and add that the only issue to be determined is as to whether the machine used by plaintiff was reasonably safe or had the defects complained of. The objection urged in this court is that the question of whether the particular machine here complained of was reasonably safe is to be determined by its actual condition and not by comparison

with another machine used for like work. This evidence was elicited from plaintiff's first witness and he seeks with some force to justify this evidence as tending to show that plaintiff was allowed to use the machine he did use and was not a volunteer in so doing—an issue sharply drawn by defendants' answer. Looking at the merits of the contention, there is no doubt that the master is not required to furnish the safest or best appliance, nor is he to be charged with negligence on a mere showing that a safer appliance might have been furnished. [3 Labatt's Master & Servant, sec. 931.] If the instrumentality actually furnished is reasonably safe for the purpose and in the manner intended to be used, then that is sufficient. [Grattis v. Railroad, 153 Mo. 380, 403, 55 S. W. 108; Blundell v. Elevator Mfg. Co., 189 Mo. 552, 88 S. W. 103.] The jury were plainly instructed that the law is as here stated and could not easily have been misled on this point. So far as comparing the two machines is concerned, the evidence objected to tends to show that the other machine was a better one and did better work rather than that it was a safer one. There is little, if any, suggestion in the questions and answers given that the machine used by plaintiff was not as safe as the newer one. It is probable that the questions were asked with the view to have the witnesses point out some claimed defects in the machine in question and that would have been proper. To be reversible error the evidence elicited must be so prejudicial to defendants as to raise a probability that the jury were led to believe that because the new machine was a safer one, then the defendants were negligent in having plaintiff use the one less safe. This is not probable when an instruction was given that defendants were not to be held negligent for failure to furnish a machine of a particular type and with the latest improvements, but that all the defendants were required to do was to furnish a machine reasonably safe. When the witnesses

were asked directly as to the comparative safety of the
two machines the evidence was excluded.

The evidence admitted, so far as it bears directly
on the comparative safety between the two machines,
could only have reference to the minor defect of hav-
ing a too large space between the end of the table and
the revolving head, as that is the only difference shown
in the construction of the two machines. The evidence
had no bearing on the principal defects, as to the tilt-
ing downwards of the table when pressure was applied
and the using of the machine without the device for
holding the boards without using the hands. Nothing
is shown as to the other machine in these respects and
such were not defects of construction and intended use,
but of negligence in permitting the machine to be out
of repair.

Nor is it always improper to show that another
method of construction or operation of an instrumen-
tality in actual use is practical and avoids the dangers
of the one in question as tending to show that the one
in question is not reasonably safe. ''A more logical as
well as a more equitable rule would therefore seem to
be this—that evidence tending to show that a safer
instrumentality might have been used, has an appre-
ciable bearing upon the question whether the one ac-
tually used was reasonably safe, and may or may not
be conclusive, according to the other elements presented
by the case.'' [3 Labatt's Master & Servant, sec. 932,
p. 2515.] There are cases in this State upholding this
doctrine. [Charlton v. Railroad, 200 Mo. 413, 443, 98
S. W. 529; Letanovsky, v. Shoe Co., 157 Mo. App. 120,
126-7, 137 S. W. 321.] Whether such evidence is ad-
missible in a particular case may depend on the facts
and issues of such particular case, and where its sole
purpose and effect is to set up as a standard of negli-
gence that a safer instrumentality could have been fur-
nished, the evidence should be rejected. [Conway v.
Railroad, 24 Mo. App. 235; 3 Labatt's Master & Serv-

ant, sec. 931, p. 2506.]    We decline to reverse the case on this ground.    Objections were made to other evidence which we have examined and found have a tendency to show knowledge of the master as to the defects complained of, and, while the answers are too broad and general, the questions, which alone were objected to, are, as the trial court ruled, not objectionable.

In the present case plaintiff's sole injury, a severe one to be sure, is that he lost the ends of the four fingers of his left hand at or near the second joint, attended with the usual and necessary suffering and bodily impairment incident to such an injury.    His wound healed in the usual time and manner.    His injury and suffering were just such, and no more, as are usual and necessary in having his fingers suddenly cut off in the manner mentioned.    The usefulness of his left hand is greatly impaired of course, necessitating in all probability a change in occupation and permanent loss of earning power.    He is a man in middle life and was earning $75 to $80 per month at the time of his injury. He promptly recognized that $10,000 was an excessive verdict and voluntarily reduced it to $7500.    Under the rulings of the Supreme and other Appellate Courts of this State, we think the amount of damages is yet too large.    [See cases cited in Sanders v. Quercus Lumber Co., 187 Mo. App. 408, 173 S. W. 740, 741.]    We have concluded that $6,000 is all that can be allowed in this case.    If the plaintiff will within ten days remit $1500 of the amount awarded in the judgment of the trial court, a judgment will be entered here for $6,000 as of the date of the original judgment with interest from that date.    Otherwise the case will be reversed and remanded.

*Farrington, J.,* concurs.    *Robertson, P. J.,* concurs except as to the reduction of the amount of the verdict.