AGNES M. MURPHY v. FRED WOLFERMAN, INC., Appellant.—148 S. W. (2d) 481.

Division One, March 13, 1941.

*R. B. Caldwell, Stanley. Garrity, John W. Oliver* and *McCune, Caldwell & Downing* for appellant.

*Homer A. Cope, Cope & Hadsell* and *Walter A. Raymond* for respondent.

BRADLEY, C.—Action for damages for personal injury alleged to have resulted by falling from a stair landing in defendant's store. The jury returned a verdict in favor of plaintiff for $15,000. Motion for a new trial was overruled and defendant appealed.

Defendant operated a retail grocery store, facing east, at 1108 Walnut Street, Kansas City, Missouri. Near the rear and on the south side of the store, a stairway led from the first to the second floor. The first five steps of the stairway are marble and go south, so to speak, to a marble landing, then turn west and go up to the second floor. The landing is 3 feet and 4 inches above the floor, and, in size, 4 feet 10 inches, by 4 feet, 5 inches. On the east wall

of the landing, defendant had, for the convenience and use of its customers, two public pay telephones.

Plaintiff alleged that in the afternoon of April 16, 1938, she entered defendant's store for the purpose of purchasing merchandise and while therein found it necessary to use a telephone and that she went up the steps to the landing where the public pay telephones were; that there were some boxes of merchandise on the landing; and that an employee of defendant, while in the scope of his duty, negligently pitched a wooden delivery box with merchandise therein onto the landing and struck plaintiff's legs, or struck another box on the landing, and drove it against plaintiff's legs, causing her to fall from the landing down to the floor.

The answer was a general denial and a plea of contributory negligence to the effect that if plaintiff received any injuries at the place complained of in her petition, the same were directly caused by her own negligence in failing to observe her whereabouts, etc.

In order to better understand the *locus in quo* we here reproduce a portion of plaintiff's exhibit 2. The reproduction represents the west end of the store.

Defendant assigns error (1) on the refusal of a demurrer to the evidence at the close of the whole case; (2) on plaintiff's instruction No. 1; (3) on failure to discharge the jury because plaintiff "cried, wept, and shed tears in the presence of the jury;" and (4) on an alleged excessive verdict.

Measured by the demurrer, plaintiff's case was as follows: Plaintiff was 55 years old; was reared in Kansas City; lived with her son and invalid husband; had been defendant's customer for about 27 years. April 16, 1938, date of her injury, was Saturday and the day before Easter. In the afternoon she was down town and went into defendant's store to purchase some Easter egg candy and a basket to give to the nuns of St. Mary's hospital. She did not find what she wanted and went across the street and got it, but returned to defendant's store about 2 P. M. to buy "one of the large chocolate eggs they have filled with smaller candies as an Easter gift" to her husband.

According to plaintiff, when she returned to defendant's store, customers were "standing two rows deep at the candy counter" which was some distance east of the cheese counter, and plaintiff, seeing that she had to wait, and remembering that her son wanted to buy a pair of shoes for Easter, and realizing that she had not left him any money, decided to call and have him meet her down town. She was familiar with the location of the public pay telephones, because she had used them many times. "There was no package or box on any of the steps leading to the platform" (landing), according to plaintiff, and she went up the steps to the landing. When she got to the top step she noticed that there were on the landing two egg crates about a foot from the front of the landing and about midway thereof. One was on top the other, and they extended north and south, except the top one extended a bit to the southeast and northwest. The crates were about 28 inches in length and 12 inches in width, and about 12 inches deep. There were some packages, on the landing floor, along the south wall. There were two paper cartons of eggs between the egg crates and the north telephone which plaintiff intended to use. Plaintiff explained her approach to the telephone and her fall as follows:

"I ascended the steps to the platform (landing) and when I stepped on the platform I moved this small paper carton of eggs to give myself a better footing. I looked in my purse to see if I had some small change. I set the purse on this small table (under the telephone), looked in the purse to see if I had any small change. I had two nickels. I got a nickel out and closed my purse and put it back on my arm, just customarily. I dialed the phone and had finished dialing. I had the receiver to my ear and was looking out over the store waiting for my husband's nurse to answer the telephone and I heard a noise and glanced over the store, glanced backward, and saw a Wolferman employee starting up the steps with a delivery box,

I call it a delivery box, it was full of packages, and he had just ascended about two steps when he shoved or pushed the box to the platform and something struck my limbs, instantaneously something struck my limbs. My left leg buckled under me and down the steps I went.''

Plaintiff was rendered unconscious and so remained, except for short intervals, until about 9 A. M. next morning. The employee who pitched the box was not identified, but defendant does not claim that plaintiff's evidence did not tend to show that its employee pitched the box that caused plaintiff to fall, if she fell as she says.

The store was crowded with people, but no one saw plaintiff fall so far as appears in the record. Witnesses for plaintiff and for defendant testified to hearing a *thud*, a *thump*, a *plop*. No witness, except plaintiff's witness, Mary Hopkins, an employee in the store, heard any groan or moan. Mary said that she heard ''a thud and then a groan.'' She was near where plaintiff was picked up, but did not ''go out where the noise of the thud or the groan came from.'' Instead, she ran ''through that back door'' because she was afraid of ''blood or anything.''

Defendant contends that plaintiff fell *at* a point near the south end of the cheese counter, and not from the landing, and its evidence tends to show that at the time plaintiff fell there was a line of people between the steps and the point where defendant's evidence tends to show plaintiff was picked up. Plaintiff, however, testified to the effect that no one was immediately in front of the steps when she fell. Defendant relies principally upon its witnesses, Charles Arnold and Grace Gilchrist, to support the contention that plaintiff fell at a point near the south end of the cheese counter and not from the landing. The cheese counter, as appears from exhibit 2, supra, extended north and south; the south end was 5 feet 2 inches north from the steps that led up to the landing, and the west side was about on a line with the west side of the steps. The meat counter also extended north and south and was 6 feet, 5½ inches west of the cheese counter, but so placed as to extend south to a point somewhat near the east and west line of the steps. The cashier's place was between the west side of the steps and the south end of the meat counter.

Arnold was employed by the Liquid Carbonic Company, which did the soda fountain repair work for defendant, and had theretofore done work in defendant's store. On the occasion of plaintiff's fall he was in the store, but as a customer. He testified that he was between the cheese counter and the meat counter, about one foot ''north of the south end of the cheese counter;'' that he did not see plaintiff fall; that when he first saw her she was lying on the floor; that she was about one foot and a half south of the cheese counter, the body extending east and west, with the head about one foot on the west side of the cheese counter. The steps leading to the land-

ing were about 5 feet east and west, and as stated, it was 5 feet and 2 inches north from the steps to the south end of the cheese counter. Plaintiff's height is not given, but if she was 5 feet, then when Arnold saw her lying on the floor her feet were, according to his evidence, 3 feet and 8 inches north and one foot west of the east side of the steps where plaintiff says she was standing (on the landing) when she fell.

Arnold started to pick up plaintiff, but when he "had her raised up" an elevator boy went "over and picked her up." On the question of people being between the steps and the place where plaintiff was picked up, Arnold testified: "Now, I will ask you to tell the jury whether or not at the time you picked Mrs. Murphy up there was any people standing between her, where she was on the floor, and the steps and platform that you see in the plat? A. Well, there was a few people going up to the cashier's cage there from both sides."

Mrs. Gilchrist testified that she was in the store as a customer, and was about midway between the cheese and meat counters, and about even with the south end of the cheese counter; that she was facing east and waiting in line for her turn at the cashier; that she was looking down, thought she was getting money out of her bag; that she heard a noise and "looked up and saw this lady sprawled" on her stomach on the floor about 3 feet ahead. It will be noted that Mrs. Gilchrist placed plaintiff nearer the steps than did Arnold. She said that the man she saw lift plaintiff carried her to the elevator. Mrs. Gilchrist further testified that shortly after plaintiff had been taken away she (witness) wanted to use a telephone, but could not get to the telephones on the landing because "each step was covered high with boxes." Edward Schettler, an employee in the store and plaintiff's witness, stated in his deposition, that he saw plaintiff picked up "from the bottom of the steps," but on the stand said that was wrong; that he did not see her picked up.

Ruth Ann Story, who was nurse for plaintiff's invalid husband, testified that the telephone at plaintiff's home rang around "two o'clock" on day of plaintiff's fall; that she answered; that there was then no one on the line.

Defendant bases the demurrer to the evidence on two grounds, viz.: (1) That there is no substantial evidence to support the charge of negligence; and (2) that plaintiff was guilty of contributory negligence as a matter of law.

The first ground is presented under two theories, viz.: That plaintiff's evidence is "contrary to physical law," and that in any event, plaintiff, at the time of the alleged fall, was a mere licensee, and if so, the evidence is not sufficient to support recovery.

On the first theory, defendant, in the brief, says: "We are mindful of the reluctance with which courts disturb verdicts of juries because the plaintiff's testimony is contrary to physical facts. . . . But

the physical facts point, with a certainty that cannot be overlooked, in the direction that she was never upon the platform. There is absolutely no evidence in the record that plaintiff was upon the platform at the time in question except plaintiff's own testimony."

A "court may properly reject evidence which is contrary to the physical facts or to known physical laws, or which is the result of evident mistakes or ignorance, or, in short, when the evidence itself, or the other established facts, discloses its inherent infirmity," Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 62 S. W. (2d) 1079, l. c. 1082. See also Hardin v. Illinois Central Ry. Co., 334 Mo. 1169, 70 S. W. (2d) 1075, l. c. 1079, and cases there cited, but "it requires an extraordinary case to authorize the court to regard sworn testimony as manifestly impossible and untrue. . . . So frequently do unlooked for results attend the meeting of interacting forces that courts should not indulge in arbitrary deductions from physical law and fact except when they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other." [Parent v. Mobile & Ohio Railroad Co., 334 Mo. 1202, 70 S. W. (2d) 1068, l. c. 1074; Bloecher v. Duerbeck, 338 Mo. 535, 92 S. W. (2d) 681, l. c. 685; Schupback v. Meshevsky (Mo.), 300 S. W. 465, l. c. 467.]

There is nothing here contrary to physical law. Clearly it is only a conflict of evidence, and the jury was the judge of the credibility of the witnesses.

Was plaintiff a mere licensee at the time of her fall? As appears, supra, defendant's evidence tends to show that the steps leading to the landing were stacked with merchandise, and defendant says that it was obvious that the landing telephones were not available for customer use, and that by going upon the landing, under the circumstances, plaintiff abandoned her status as a customer invitee and became a mere licensee. If plaintiff was a licensee, the only duty defendant owed her was not to wantonly injure her. [Gilliland v. Bondurant et al., 332 Mo. 881, 59 S. W. (2d) 679, l. c. 687.] "An invitee to the premises of another has the right to go to all portions of the premises which are included within the invitation and it is necessary or convenient for the invitee to visit or use in the course of the business for which the invitation was extended, and at which his presence should therefore reasonably be anticipated," 45 C. J., sec. 240, p. 830; Philibert v. Benjamin Ansehl Co., 342 Mo. 1239, 119 S. W. (2d) 797, l. c. 800; Watson v. St. Joseph Coal Mining Co., 331 Mo. 475, 53 S. W. (2d) 895; Glaser v. Rothschild, 221 Mo. 180, 120 S. W. 1, 22 L. R. A. (N. S.), 1045, 17 Ann. Cas. 576, and it would follow, of course, that an invitee, as such, would have no right to go places on the premises not within the scope of the invitation.

It is conceded that the wall telephones on the landing were public pay telephones and kept by defendant for the convenience and ac-

commodation of its customers. Defendant's evidence tended to show that "during the week before Easter," it "had an overflow business in the candy department," and that the landing, from which plaintiff says she fell, was, at the time, being used exclusively as a place to wrap packages on a table placed on the landing for that purpose. Also, defendant's evidence, as appears, supra, tends to show that the steps leading to the landing were "blocked off." Defendant's floor manager testified that "the lower step was entirely blocked off; the cartons (of candy) projected lengthwise to each other to block it off; and then there were other cartons at various positions on those other steps as well." According to defendant the cartons of candy, wrapped on the landing, were to fill mail orders and were not taken up to the landing from the first floor during the day plaintiff was injured, but were previously placed on the stairs leading from the landing to the second floor. And the floor manager also testified that when the cartons were wrapped by the girl on the landing she placed them "at any opening" available on the steps leading from the floor up to the landing "where they would be accessible to the delivery department." Plaintiff testified that no one was on the landing when she fell and defendant's porter testified that the girl who was wrapping packages on the landing had gone to lunch at that time. The girl, Miss Ruth Meisen Kueske, was not a witness.

According to plaintiff, as appears, supra, the steps were clear; and no great number of boxes or packages on the landing. She knew the location of the landing telephones; had used them many times, and there was no warning, by sign or otherwise, that the landing telephones were not to be used by the customers that afternoon.

Instruction No. 9, requested by defendant, told the jury that it was lawful for the defendant "to use the landing and stairs where the public telephones are located for the purpose of piling, storing and wrapping packages and the purposes for which the same were being used on April 16, 1938, and in this connection you are instructed that if Mrs. Murphy saw or by the exercise of ordinary care could have seen that the stairs and landing were being used for these special purposes, if so, and that it would be dangerous for her to try to ascend the stairs, if so, or use the telephone at that location, if so, then you are instructed that Mrs. Murphy is not entitled to recover in this case and it is your duty to and you must return a verdict for the defendant."

We are constrained to rule that as to whether plaintiff abandoned her status as an invitee and became a mere licensee by going upon the landing was, under the evidence, a question for the jury.

Defendant's assignment based on the contention that plaintiff was guilty of contributory negligence as a matter of law, is, in effect, ruled, supra, adversely to defendant. The demurrer to the evidence was properly refused.

Defendant contends that plaintiff's instruction No. 1 was bad in that (1) it "did not require a finding that plaintiff was an invitee at the time and place of her injury;" (2) that it ignored "the issue of plaintiff's legal status on the platform;" (3) that it "did not require a finding that plaintiff was in a position of peril so as to authorize a recovery if plaintiff was a licensee;" and (4) that "said instruction is in conflict with instructions given on behalf of defendant."

Instruction No. 1 required (among others) these findings before plaintiff could recover: (1) That defendant maintained for the use of its customers the two wall telephones on the landing; (2) that plaintiff, at the invitation of defendant, entered the store as a customer and while therein desired to use the telephone; and (3) that plaintiff, in the exercise of ordinary care for her own safety, ascended the steps.

It is true that the instruction does not, in terms, require a finding that plaintiff was an invitee at the very moment of her fall, but it will be conceded that plaintiff was an invitee before she decided to use the telephone, and defendant concedes that the landing telephones were for the use of its customers. Hence plaintiff never lost her status as an invitee by going upon the landing, unless she should have known, in the exercise of ordinary care, that the landing telephones were withdrawn from public use. And, as stated, the instruction requires a finding that plaintiff exercised ordinary care in ascending the steps. If she exercised such care in ascending the steps, and the jury so found, then she did not lose her status as an invitee. Hence, the instruction does, in effect, require a finding that she was an invitee at the time of her fall.

Is instruction No. 1 "in conflict with instructions given on behalf of defendant?" The court gave 15 instructions requested by defendant, but counsel do not point out the instruction or instructions with which No. 1 conflicts. However, we infer from the brief that defendant has reference to its instructions 9 or 10 or both. Plaintiff's instruction No. 1 submitted the hypothesis, "If you further find . . . that said stairway and said platform were not so obstructed as to be withdrawn from the use of the public."

Defendant's instruction No. 9 is set out, supra, and No. 10 follows: "The court instructs the jury that if you find and believe from the evidence in this case that the lower step of the stairs in question was blocked off with boxes, if so, in such a way that an ordinary careful and prudent person would not attempt to ascend the same, if so, then you are instructed that Mrs. Murphy had no business attempting to use the telephones (if you find she did) and your verdict must be for the defendant, regardless of every other issue in the case."

Defendant says that the language, *so obstructed as to be withdrawn,* in instruction No. 1, was tantamount to telling the jury that unless the

steps and landing were so obstructed "as to be impregnable," plaintiff could recover. As appears, supra, instruction No. 1 required a finding that plaintiff, in the exercise of ordinary care for her own safety, ascended the steps. When all parts of plaintiff's instruction No. 1, on the point, are considered together, it is no different, in effect, to instructions 9 and 10 given at the request of defendant.

In Larey v. Missouri-Kansas-Texas Ry. Co., 333 Mo. 949, 64 S. W. (2d) 681, l. c. 684, the court, citing many cases in support, said: "When we look to instructions given at the request of the defendant, however, we find that any of these requirements not clearly and definitely stated in plaintiff's instructions are made clear, definite, and certain beyond all question. It is well settled that all instructions must be read and construed together; that where a series of instructions thus taken together contain a complete exposition of the law and cover every phase of the case, there is no prejudicial error; and that when taken and construed together, they harmonize and clearly and specifically require the finding of all essential elements, then any indefinite, ambiguous, and misleading language in the plaintiff's instruction is thereby cured."

■ Was it error to refuse to discharge the jury because plaintiff cried? When plaintiff was first called to the stand, the following occurred: "Q. Mrs. Murphy, in giving your testimony will you talk loud enough so that all the twelve gentlemen of the jury may here you, as well as his Honor and counsel? A. Yes, sir, I will try to. Q. Will you state your full name to the court and jury? A. Agnes M. Murphy. Q. Where do you live, Mrs. Murphy? (The witness here wept.) A. Just a moment. 102 West Armour. Q. (By Mr. Cope). How old are you, Mrs. Murphy? A. Fifty-six. Q. Do you want to rest a while? A. I am sorry, Mr. Cope, but I can— I just— Mr. Cope: Just stand aside. Get her a drink of water."

Then, out of the presence of the jury, defendant asked that the jury be discharged, and such was refused. "The discharge of the jury because plaintiff cried rested in the sound discretion of the court," Lynch v. Baldwin (Mo.), 117 S. W. (2d) 273, l. c. 276; Boyer v. Mo. Pac. Ry. Co. (Mo.), 293 S. W. 386, and we do not think that discretion was abused.

■ Is the verdict of $15,000 excessive? From plaintiff's case, the facts pertinent to this assignment are about as follows: At the time of injury plaintiff was 55 years old; "felt well all the time;" helped with the cooking and with the housework; did the household marketing; helped take care of her invalid husband, and sometimes played basketball with her son and his friends. As stated, she fell about 2 p. m., and was unconscious thereafter, except at intervals, until about 9 a. m. next day. She received a brain injury; a complete fracture of the left clavicle; lost a tooth; the back of her head was swollen, and her nose bled. She was in the hospital from April

16th to May 9th; and while therein frequently had narcotics and an ice pack on her head. Dr. J. Park Neal examined her May 13, 1938, and March 23, 1939. Dr. Neal testified that she had "some instability in coordination and loss of equilibrium. Her reflexes were somewhat abnormal. . . . She had a healed or partially healed fracture of the left clavicle. . . . There was considerable overlapping, so much so that it shortened the clavicle about three quarters of an inch. . . . There was much muscle spasm, limitation of motion in the lumbar and dorsal regions. . . . My conclusion . . . (was) that she had had a brain injury; that she had had a back injury; . . . that she had suffered a trauma of the brain; . . . that she had had a rather severe concussion of the brain. . . . Q. Doctor, the type of injury which you observed Mrs. Murphy suffering from, could that be caused by just merely fainting or swooning down or would it require severe trauma or violence to produce the injuries which we find in the X-rays, as well as which you found in your examination? A. Well, it took considerable trauma and violence to break that clavicle. That is evidence in any way. This other matter that we find here in the spine took considerable trauma. The results or the conclusions I reached regarding her brain injury took considerable trauma.''

Dr. Clyde Donaldson made X-rays of plaintiff on March 23, 1939. Speaking of one of the X-ray pictures, Dr. Donaldson said: ''I note . . . in reading this picture, that what we term the sella turcica, that is a saddle-like bone in behind the nose, away deep in behind the nose, the posterior processes or what we term the clinoidal processes are either broken off or eroded so that there is something happened to that clinoidal process of the sella turcica. . . . I think it was caused by trauma. . . . Q. What would have to be the type of injury that would produce the result and abnormality you find in the picture, in your opinion? A. It would have to be pretty severe, violence displayed through the body and possibly the head. . . . Q. Can you tell us from your experience as an X-ray specialist noting the abnormality you have described to the court and jury, how that might affect this particular lady? A. Well, I can only answer in a general way. I don't know anything about the effect to this woman, but I would expect her to have some difficulty in the first place with her eyesight and then I would expect her to have some headaches, principally headaches, and that is about all that I can think of.''

Dr. H. Lewis Hess was called to see plaintiff May 12, 1938. He testified that she had a dizziness; was unable to walk steadily without assistance; had a tendency to incline to the right; her tongue was affected; she spoke as though her tongue was quite thick; that he saw plaintiff 12 to 15 times; that she was unable to go to his office for about two months. ''Q. Doctor, did you see anything about Mrs.

Murphy's condition or the symptoms which you observed or which you determined from your examination that indicated that she had suffered a cerebral thrombosis or a stroke or an apoplexy? A. No. Her symptoms were not that of a stroke or an apoplexy as there was not a complete paralysis. That is, there was movement of extremities, but a certain lack of control of those movements which was in the brain proper and not a definite paralysis.''

According to plaintiff, she suffered considerable pain and had the headache all the time. ''I have a dizziness too that I don't seem to be able to get rid of, but I have constant pain in my head and in this side (indicating) clear across the lower portion of it. I sit most of the time with my head, just taking care of it, resting it in my hands. . . . My shoulder continues to ache and my arm bothers me. I can't lift my hand up. I can't even lift a tea kettle . . . My back still bothers me just below my waist line and in through my hips, and if I bend over I can hardly get erect. I can't stand erect. . . . I had a girdle made and I am wearing it to help relieve my back condition . . . Q. Mrs. Murphy, have you done any of the housework at all since you have come home from the hospital? A. No, sir, I still have help. I have had help ever since my accident.''

Plaintiff testified that she was not subject to fainting spells; that she did not recall ever fainting.

The evidence of plaintiff's doctor witnesses was that her injuries were permanent. It will not be necessary to set such evidence out.

There was a marked difference in the evidence of plaintiff's and defendant's doctor witnesses. Drs. Horace Flanders, Rial R. Oglevie, E. R. DeWeese, and B. Landis Elliott, were witnesses for defendant. Drs. Flanders and Oglevie were associated, and handled emergency calls for defendant. Dr. Flanders saw plaintiff, in the ladies' rest room on the 4th floor of defendant's store, a few minutes after her fall. He said that she was in obvious shock; that he ''felt that she had suffered a light stroke and that she had injured the left shoulder.'' Dr. Oglevie saw plaintiff at the hospital (St. Mary's) about 3 hours after the fall, and said that she was in a semistuporous or semiconscious state; complained of pain about the left shoulder; that he continued to see her while she was in the hospital; saw no ''evidence of violence or trauma about the head.''

Dr. DeWeese did the X-ray work at St. Mary's hospital, and made X-rays of plaintiff while she was in the hospital. He testified that the X-ray pictures he made showed no injury to the sella turcica.

Dr. Elliott, at the request of Dr. Oglevie, examined plaintiff while she was in the hospital. He had theretofore met plaintiff while treating her son. He testified that he found no head injury, but that she had some injury to the left shoulder; and high blood pressure; that ''an injury to the head can cause a high blood pressure indirectly by causing a swelling of the brain and a compensatory high blood

pressure." He said that plaintiff told him that "about July 4, 1936, she had a heat stroke, what she called a heat stroke, and that on that occasion her blood pressure went up to 180 and she was in St. Margaret's hospital for about a week," and that Dr. Krall, Kansas City, Kansas, treated her. Plaintiff denied telling Dr. Elliott that she had a heat stroke and said that she never had high blood pressure before the fall.

"When the facts as to the injuries inflicted and losses sustained are similar . . . there should be a reasonable uniformity as to the amount of verdicts." [O'Brien v. Rindskopf et al., 334 Mo. 1233, 70 S. W. (2d) 1085, l. c. 1093.] With this rule in mind we are of the opinion that the verdict is excessive by $5,000. [Crockett v. Kansas City Rys. Co. (Mo.), 243 S. W. 902, l. c. 909; Meyers v. Wells (Mo.), 273 S. W. 110, l. c. 117; O'Brien v. Rindskopf, supra.] To here set out the injuries in these cases would, unnecessarily, further lengthen the opinion, which is already lengthy.

If plaintiff will, within 10 days from the date of filing this opinion, enter here a *remittitur* of $5,000, the judgment for $10,000, as of the date of the original judgment, will be affirmed; otherwise, the judgment will be reversed and the cause remanded because of an excessive verdict. *Hyde* and *Dalton, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.