Fred H. KIBURZ, Administrator of the Estate of Roger Kiburz, Deceased, Respondent,

v.

LOC–WOOD BOAT & MOTORS, INC., a Corporation, et al., Appellants.

No. 48871.

Supreme Court of Missouri,

Division No. 1.

May 14, 1962.

Elwyn L. Cady, Jr., Kansas City, for appellants.

Homer A. Cope, Donald W. Browne, and Walter A. Raymond, Kansas City, Raymond, West & Cochrane, Kansas City, of counsel, for respondent.

DALTON, Presiding Judge.

Action for $25,000 damages for the wrongful death of plaintiff's decedent, Roger Kiburz. Verdict and judgment were for defendants but, on motion, the court set the verdict and judgment aside and granted plaintiff a new trial on the ground (1) that the verdict of the jury was against the weight of the evidence and (2) that the court erred in giving defendants' Instructions No. 10 and 11. Defendants have appealed "from the order granting a new trial to plaintiff."

The petition charged that on June 7, 1958, at about 10:45 a. m. decedent's death was caused by being struck by the Tuscumbia, a pleasure boat for sightseers operated by defendants on the Lake of the Ozarks. The particular negligence charged and submitted was a failure to maintain and keep a proper lookout ahead and laterally for individuals, including Roger Kiburz, vessels or obstructions upon the waters of the lake; failure to turn, swerve or alter the course

of the Tuscumbia to avoid striking the said Roger Kiburz; the operation of the Tuscumbia at a high, dangerous and reckless rate of speed under the conditions and circumstances there and then existing, and the failure to slacken or slow the speed or forward motion of the Tuscumbia after its operator knew or, by the exercise of ordinary care, could have known of the danger of collision with Roger Kiburz and of his imminent peril. Plaintiff's principal instruction further submitted a finding that as a direct and proximate cause of the negligence submitted, the Tuscumbia struck the said Roger Kiburz, causing severe injuries of which he immediately thereafter died and disappeared beneath the water; and that he was single and unmarried, 22 years of age and left no wife or minor children, natural-born or adopted, but did leave certain brothers and sisters and other heirs to whom he contributed support.

■ Appellants' brief in this court has not assigned error on the trial court's action in granting plaintiff a new trial, nor does appellants' brief indicate that appellants' counsel has either read or seriously attempted to comply with Supreme Court Rule No. 83.05, V.A.M.R. in the preparation of appellants' brief. The brief is deficient in a number of respects and the appeal could properly be dismissed for failure to comply with the mentioned rule; nevertheless, since we have reached the conclusion that the order must be affirmed, we shall overrule respondent's motion to dismiss and rule the single issue which we believe the appellants intended to present on this appeal.

Under "points relied on" appellants only say: "The court erred in overruling defendants' motions for directed verdicts inasmuch as plaintiff had not established a prima facie case entitling him to submit his case to a jury." However, since verdict and judgment were for the defendants, it is evident that defendants were not prejudiced by the mentioned order. If defendants were prejudiced in any respect it was by the court's order setting the verdict and judgment aside and granting the plaintiff a new trial. We shall construe appellants' assignment to mean that the trial court erred in granting plaintiff a new trial, because the evidence was insufficient to make out a submissible case for the jury.

■ If no submissible case was made for the jury, that is, if defendants' motions for a directed verdict should have been sustained as a matter of law at the close of all the evidence, then it would be an arbitrary act and an abuse of the trial court's discretion to grant a new trial to plaintiff after a verdict for defendants. Rose v. Thompson, 346 Mo. 395, 141 S.W.2d 824, 827–828. In Castorina v. Herrmann, 340 Mo. 1026, 104 S.W.2d 297, 300, this court said: "To grant a new trial, on the ground that the finding was against the weight of the evidence, would be arbitrary if there was no evidence to weigh." And see Brooks v. Stewart, Mo.Sup., 335 S.W.2d 104, 105 (1, 2), 81 A.L.R.2d 508 and cases cited.

■ At the close of plaintiff's evidence and at the close of all the evidence no written motions for a directed verdict were filed and the oral motions presented by the respective defendants, except Loc-Wood Boat & Motors, Inc., assigned no grounds in support of the motions, although various specific affirmative defenses had been pleaded. See Supreme Court Rules 55.30 and 72.01. Defendant Loc-Wood Boat & Motors, Inc. at the close of plaintiff's evidence and at the close of all the evidence asked for a directed verdict on the ground "that the record fails to show a cause of action against the defendant Loc-Wood Boat & Motors," hence this defendant, as appellant, is in a position to raise the question of error in granting the plaintiff a new trial and may insist that the order was erroneous because plaintiff failed to make a case for the jury on the negligence pleaded and submitted against it.

Appellants' brief does not refer to the individual defendants-appellants nor attempt to deal separately with them. Nor does appellants' brief refer to the specific

assignments of negligence submitted to the jury. The nearest approach is appellants' contention that "there is absolutely no credible evidence at all" as to the "cause of death" or the "relationship of proximate cause between *any negligence* and legal injury." (Italics ours.) Appellants' position is based upon the theory that certain testimony, which appellants consider essential to a submissible case, is "at war with plain physical facts and laws" and, therefore, is inherently worthless and insufficient to support the submission of the cause.

Roger Kiburz' body was never found and there was no death certificate and no coroner's inquest; however, an extended investigation was conducted by the State Highway Patrol and the U. S. Coast Guard and appellants concede there was evidence "of the fact of death" and of "damage (legal injury)."

■ In determining the issues presented, we must consider the evidence in a light most favorable to plaintiff and give him the benefit of all favorable inferences reasonably to be drawn from all the evidence and disregard defendants' evidence unless it aids the plaintiff's case. Highfill v. Brown, Mo. Sup., 340 S.W.2d 656, 658; Winger v. General American Life Insurance Co., Mo.Sup., 345 S.W.2d 170, 173.

■ Under the issue submitted on appeal by appellants we may limit our inquiry to any negligence of the defendant submitted by plaintiff as having caused Roger Kiburz' death. Accordingly, we shall direct our attention to the submitted assignment that "defendant Cloyd Chester Perrin was the pilot in charge of and operating the said Tuscumbia; and that he was operating said Tuscumbia in line of his duty and scope of his employment as the duly authorized agent, servant and employee of defendant Loc-Wood Boat & Motors Co., Inc. * * *; that said Perrin caused or permitted the Tuscumbia to run into and against said Roger Kiburz, as a direct and proximate result of which the said Roger

Kiburz received such injuries that he was caused to immediately disappear under the water and to die * * *; and that defendant Perrin, while acting on behalf of himself and as the duly authorized agent, servant and employee of the other defendants named herein, failed to maintain and keep a proper lookout ahead and laterally for individuals, including Roger Kiburz, vessels or obstructions upon the water, and that he was thereby negligent in failing so to do * * *; and that as a direct and proximate result of the negligence of said defendants and each of them as aforesaid" Roger Kiburz was injured and died.

The record shows that the occurrence in question happened on the Lake of the Ozarks on the morning of June 7, 1958, about four and one-half miles west of Bagnell Dam, and some 300 feet from the north shoreline of the lake. The record further shows the area about the lake to be a resort area where boating, skiing and other water sports are engaged in, particularly during the summer season; that ski shows and pageants were carried on in the lake area; that one of defendants' witnesses was President of the Ozark Water Ski Club; that he had been professionally engaged in water ski activities, mostly at the Lake of the Ozarks; and that in connection with his professional employment he taught water skiing and small boat safety on a professional basis on the lake. Much evidence offered by defendants tending to show the extent of boating and ski activity was excluded by the court on objection of plaintiff's counsel.

The evidence further shows that the Tuscumbia was a 12-ton, 30-passenger, 40-foot excursion boat powered by two 200-horsepower motors, with machinery and equipment in good order; that it had a normal cruising speed of 22 m. p. h.; that it was painted white above the waterline and was regularly used as a pleasure craft for sightseers, with a regular run consisting of a 35-mile round trip on the lake, going up along the north shore and returning along the south shore.

At about 10:45 a. m. on June 7, 1958, the weather was clear, visibility was good, the lake was calm and there was no obstruction to view ahead, as the Tuscumbia moved westward on its regular course, outbound from Bagnell Dam. At that time, Roger Kiburz, age 22, a good swimmer, agile, muscular and in good health, was boating and skiing on the Lake of the Ozarks with Charles Betz of about the same age. They had been taking alternate turns in operating the boat and skiing. Their boat, the Mardi Gras, a 15-foot, outboard, plywood motorboat stained a dark mahogany, was powered by a 40-horsepower motor. The boat contained the necessary skiing equipment. Usually each of the boys wore life preservers but, at the time in question, Kiburz did not have on his life preserver, but it was in good order in the Mardi Gras. The boys had been on the lake an hour or so and they were headed east toward Bagnell Dam, when Kiburz, who was then skiing, fell off his skis and Betz circled clockwise to pick him up by pulling the rope next to him (Kiburz), who was stationary in the water. As the end of the rope reached Kiburz, Betz put his motor in neutral gear and the boat stopped, headed west. Kiburz caught the rope and was adjusting his skis and was getting ready to take off, when both boys observed the approach of the Tuscumbia from the east. It was then some 50 yards away and Betz estimated that it was approaching at a speed of 20 m. p. h. Both boys, Betz standing in his boat and Kiburz in the water, began waving their arms and yelling to attract attention and to divert the Tuscumbia from its path, but without success. The right front part of the Tuscumbia hit Kiburz in the upper part of his body and chest. He went under and Betz never saw him again. The Tuscumbia, after hitting Kiburz, continued on west in a straight path some 60 to 70 feet, with no deviation in course, and the right front of the Tuscumbia struck the left rear portion of the Mardi Gras, throwing Betz from the front into the rear portion of the boat, where he landed on his back and shoulders. After the Tuscumbia had passed, and as

quickly as Betz could recover, he pulled over to the area where he had last seen Kiburz. There he noticed an area marked by blood and he dived into the water in an effort to find Kiburz. He made three dives, but to no effect. When exhausted, he got back into the boat and began yelling for help. Two boats came to his assistance. One of these boats came out from the north shore after the Tuscumbia passed and one of the passengers (Jackson) observed a boat (the Mardi Gras) to the east with a boy (Betz) hollering and waving his arms and "waving a distress signal." Jackson and his operator went to the aid of the boy and when they arrived they found him wet and sitting in the boat, but he couldn't operate it or tell them his difficulty. They repeatedly tried to find out what was wrong and finally obtained an explanation. Jackson retrieved a pair of skis, which were six feet long and seven inches wide, and one of them was split clear to the top. He also observed the ski rope cut in two pieces, with one piece 12 to 13 feet long still attached to the back of Betz' boat. The remaining portion, 60 to 70 feet in length, was loose in the water with a wooden handle and float attached. When the second boat with witness Breneman arrived, he observed that Betz was in a dazed condition and his trunks were wet. Both boats stopped their motors and floated for ten to fifteen minutes looking for a body in the water, but none appeared. Betz was then taken to Bagnell Dam. There was evidence that the *wake* of the Tuscumbia, or the wave made by its bow, and the *wash*, made by its propellers, caused a disturbance of the water surface of from two to four feet as the Tuscumbia passed.

The Tuscumbia was later examined by several witnesses at its dock at Bagnell Dam and on its starboard or right side, ten to fifteen feet back from the bow, and approximately 18 inches above the waterline, they observed a mark an inch wide and about two feet long. This mark gradually became deeper as it extended toward the back of the boat, until it was one-fourth of

an inch deep. It had also broken through the planking toward the rear of the mark. The Mardi Gras (Betz' boat) was also examined and white marks were found on the left rear corner in addition to damage on the same corner of the boat.

Plaintiff's evidence further showed that defendant Perrin, pilot, operator and in charge of the Tuscumbia, when examined on the same day of the occurrence by an officer of the U. S. Coast Guard, stated that he was employed in the mentioned capacities by the Lock-Wood Boat & Motors Co., and further stated, with reference to the matter under investigation, "I was just past Turkey Island and I saw a skier fall off his skis on the port side of my boat, the left-hand side. Instantly I saw a boat on the right-hand side of the boat, the Tuscumbia, that I had never seen before. I didn't see it before I saw the skier. I saw the skier first, then I saw the boat. I looked back. I felt a little thumping on the steering wheel like I had run over a little stick or something, and I looked back and I assumed that I had cut the ski rope of the skier. A man had come up about four feet past my propeller wash, by the side of my propeller wash and thowed [sic] his arms over his head like he was swiming towards his skis. The man in the boat that was towing the skier was standing up or squatting by the steering wheel, and I continued on up the lake on my normal cruise."

In the trial of the cause and as a witness for defendants, Perrin testified: "Well, I saw the skier fall off his skis and then I watched that he cleared the side of my boat, his skis was about six to eight feet to the left of my boat, to port side of my boat, as that is the side the boat (the Tuscumbia) is operated from, then I saw a small craft on the other side of the boat, about two to four feet from the side of my boat—" (inset ours). Perrin also testified that he first saw the small boat, in a stopped position, 150 feet ahead; that he didn't see the skier until the skier was 12 to 14 feet off to the left side and a little in front of the bow of the Tuscumbia. He had not seen the skier before. He could have stopped the Tuscumbia at its then speed of 17–18 m. p. h. in 100 feet, or 100 to 150 feet, but the Tuscumbia did not change course, reduce speed or signal before or after the boat and skier were sighted. The second time Perrin saw the small boat it was six to eight feet behind the bow of the Tuscumbia, when it was two to four feet from the starboard side. He then saw a man come up out of the water behind the Tuscumbia and swim four or five overhand strokes toward his skis. The next time Perrin saw the small boat it was 300 feet to the rear, as it cut off his view of the skier. He further testified that he felt a snap as the Tuscumbia passed and assumed he had cut the ski rope. "I felt like a ski rope went under the boat and the propellers cut it." There was also evidence that Perrin told a State Highway Patrolman that he saw the skier fall off of the skis into the water four, five or ten feet to the left of his boat, the Tuscumbia, with the small motorboat to the right of the Tuscumbia, so that the Tuscumbia passed between them.

■ The plaintiff, of course, was not bound by Perrin's testimony, not even by the portion offered by plaintiff, if it was contradicted by other evidence or inferences more favorable to plaintiff and the jury could believe or disbelieve any portion of Perrin's testimony. Cluck v. Abe, 328 Mo. 81, 40 S.W.2d 558, 559.

Other evidence offered by plaintiff (apparently to show that no lookout was kept) tended to show that at the time in question, as the Tuscumbia moved westwardly up the Lake of the Ozarks, there were some small boats and skiers "strung about the boat" and, that immediately after the pilot, Perrin, had made an announcement to the passengers of the Tuscumbia over the public address system as to the speed of the Tuscumbia, the depth of the water in that area, and other facts (one passenger testifying that Perrin said the then speed of the boat was 37 m. p. h.), certain unusual occurrences hereinafter stated took place.

Witness Pohl, a passenger in the rear seat of the Tuscumbia, testified: "There was a noise, kind of went woof" and "a momentary jerk like." I looked back and saw 30 to 40 feet to the rear "what looked like a young man come up out of the water. * * * He acted like he was fighting to try to keep on top of the water," he went under the water and didn't come up. Pohl also saw another boy standing up in an outboard motorboat and saw this boy turn his boat around to the place where witness had last seen the boy in the water and saw the boy dive from the boat into the water, come back up, get in the motorboat, stand therein and wave his arms. He heard no bell or signal before he felt a jerk and heard the noise.

Witness Griffith, a passenger seated in the right rear of the Tuscumbia, suddenly felt a bump, as if the boat had hit a big rock, and he felt a jerk. He looked to the rear and about 50 to 75 feet back of the Tuscumbia he saw a boy standing up on a small boat and "saw a young man, young looking man come up out of the water, flashing his hands, apparently trying to swim"; the man trying to swim apparently went out of sight, disappeared beneath the surface of the water and he did not see him again. He saw the boy in the little boat circle into the back path of the Tuscumbia and dive into the water, come up without the man and get back in the boat.

Witness Eller, seated in the rear of the Tuscumbia, felt a bump and was frightened because she could not swim. When she was able to look back she saw a boy dive from a small motorboat into the water. The Tuscumbia did not stop or reduce speed or change its direction immediately before or immediately after the bump.

Another witness, Capps, seated in the third seat from the rear of the Tuscumbia, said the pilot sat on the left side. She heard a bump and looked to the rear of the Tuscumbia and saw a boy's head and arms come up from underneath the water and she watched him until a small motorboat shut off her view of the man in the water. A

further statement of the favorable evidence is not required.

Appellants open their statement of facts with an argument that plaintiff relied entirely on the testimony of Betz, an eyewitness to the collision between the Tuscumbia and Kiburz, in an attempt to prove the cause of Kiburz' death. Appellants argue that the testimony of Betz on the "essential features of a prima facie case is inherently incredible and should have been stricken and disregarded under the incontrovertible physical facts rule." Appellants further question Betz' testimony to the effect that, when Kiburz was in the water yelling and waving his arms in an effort to attract attention and avoid being struck by the Tuscumbia, Kiburz was treading water with his skis on and with the upper half of his body from the waist up out of the water. Appellants also question Betz' testimony that, in addition to Kiburz' treading of water, the particular skis in view of their size and buoyancy assisted him to rise up in the water. Appellants question Betz' testimony that Kiburz had been facing westward toward the Mardi Gras, adjusting his skis, and that, when he sensed the approach of the Tuscumbia, he turned completely around facing the Tuscumbia "with all of his body above the waist up out of the water"; and that the impact of the Tuscumbia with Kiburz' body occurred "above the waterline when Roger had both hands in the air, completely out of the water above the waist."

In addition to alleged impossibility and being contra to physical facts, appellants rely upon the testimony of certain witnesses offered by the defendants to the effect that it was impossible to tread water with skis on or for Kiburz' body to be above the water level to the extent testified to by Betz. They insist it would have been impossible and outside the limits of human action for Kiburz to have been exposed from the waist up.

In argument, appellants further attack the testimony of Betz as having observed blood in the water in an area five to ten

yards across in the wash of the Tuscumbia at the place he dived into the water in an effort to recover Kiburz' body. Appellants argue that testimony is "too unreasonable to pass muster"; and that Betz, in testifying that Kiburz was able to rise to the extent mentioned in a calm, undisturbed, fresh-water lake by treading water with skis on and wearing no life preserver, has ascribed to Kiburz "super-natural power" and the testimony was inherently worthless and no case was made for the jury. Appellants cite Weltmer v. Bishop, 171 Mo. 110, 71 S. W. 167, 169, 65 L.R.A. 584; Sexton v. Metropolitan St. R. Co., 245 Mo. 254, 149 S.W. 21, 25(4); Rose v. Thompson, supra; Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 62 S.W.2d 1079, 1081; Dunn v. Alton R. Co., 340 Mo. 1037, 104 S.W.2d 311, 314; Benton v. St. Louis-San Francisco R. Co., Mo.Sup., 182 S.W.2d 61, 63 (4); Lohmann v. Wabash R. Co., 364 Mo. 910, 269 S.W.2d 885, 891(1–4) and other cases. They do not aid appellants under the facts of this record.

It is clearly apparent that the testimony which the appellants consider to be "inherently incredible" and contrary to what appellants refer to as the "incontrovertible physical facts rule" does not support the conclusion which appellants seek to draw, nor the position they have taken on this appeal. The testimony attacked is not essential in any respect to the making of a submissible case for the plaintiff, but would go only to the credibility, weight and value of Betz' testimony. Even if the evidence offered by the defendant on these matters be considered true and plaintiff's evidence, to the extent claimed, were considered false, it would not defeat the plaintiff's right to submit his case to the jury, since the evidence was sufficient to show a duty to exercise ordinary care in the operation of the boat under the circumstances shown to avoid injuring other persons on the lake, to show a negligent failure to keep such a lookout for persons on the lake and to show injury and death directly resulting from such negligent failure. The conclu-

sions to be drawn from the evidence on the issues presented were for the jury.

"The jury is not to be deprived of its right and function to find some of the facts, even some facts essential to the plaintiff's case, by reasoning upon the evidence, even circumstantial evidence, and inferring from such evidence that a certain required thing or fact existed or was true. Hardwick v. Kansas City Gas Co., 355 Mo. 100, 107, 195 S.W.2d 504, 508, 166 A.L.R. 556." Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W.2d 844, 848[1–6]. And see Murphy v. Fred Wolferman, Inc., 347 Mo. 634, 148 S.W.2d 481, 485(1), (2, 3); Steffen v. Ritter, Mo.Sup., 214 S.W.2d 28, 29(1, 2).

The court did not err in granting plaintiff a new trial. In view of the particular issues presented, it is unnecessary to determine whether plaintiff made a submissible case on each of the other assignments of negligence submitted.

The order granting a new trial is affirmed and the cause remanded.

All concur.